2017 PA Super 257

RICHARD SCAMPONE, AS EXECUTOR OF THE ESTATE OF MADELINE SCAMPONE

          Appellant

v.

GRANE HEALTHCARE COMPANY, GRANE ASSOCIATES, L.P., HIGHLAND PARK CARE CENTER, LLC D/B/A HIGHLAND PARK CARE CENTER, TREBRO, INC.

          Appellee

IN THE SUPERIOR COURT OF PENNSYLVANIA

No. 716 WDA 2015

Appeal from the Judgment Entered April 27, 2015
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): GD 2005-24806

RICHARD SCAMPONE, AS EXECUTOR OF THE ESTATE OF MADELINE SCAMPONE

          Appellant

v.

GRANE HEALTHCARE COMPANY, GRANE ASSOCIATES, L.P., HIGHLAND PARK CARE CENTER, LLC D/B/A HIGHLAND PARK CARE CENTER, TREBRO, INC.

          Appellee

IN THE SUPERIOR COURT OF PENNSYLVANIA

No. 717 WDA 2015

Appeal from the Judgment Entered April 27, 2015
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): GD 2005-24806

RICHARD SCAMPONE, AS EXECUTOR OF THE ESTATE OF MADELINE SCAMPONE

IN THE SUPERIOR COURT OF PENNSYLVANIA

Appellant

v.

GRANE HEALTHCARE COMPANY, GRANE
ASSOCIATES, L.P., HIGHLAND PARK
CARE CENTER, LLC D/B/A HIGHLAND
PARK CARE CENTER, TREBRO, INC.

Appellee                             No. 1354 WDA 2015

Appeal from the Order August 31, 2015
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): GD 2005-24806

BEFORE:  BOWES, STABILE AND MUSMANNO, JJ.

OPINION BY BOWES, J.:                        **FILED AUGUST 08, 2017**

In this appeal, Richard Scampone, in his capacity as executor of the

estate of Madeline Scampone ("Mr. Scampone" or the "Plaintiff"), challenges

a number of rulings that the trial court rendered in this long-standing

nursing home liability action.  After close review, we reverse and remand for

a new trial.

This action has been to this Court twice, the Supreme Court once, and

the trial court twice.  To clarify the issues currently before us, it is necessary

to repeat the factual and procedural background of the case.

- 2 -

## I. PRIOR PROCEEDINGS
### A. FIRST TRIAL

On September 22, 2005, Mr. Scampone instituted this action against Grane Healthcare Company ("Grane"), Grane Associates, L.P., Highland Park Care Center, LLC d/b/a/ Highland Park Care Center ("Highland"), Trebro, Inc., and Ross J. Ness, who was the general partner of Grane Associates, L.P.[1]  Highland was the licensed owner and operator of Highland Park Care Center (the "nursing home"), and Grane was Highland's parent company. Grane also managed the nursing home pursuant to a written agreement with Highland.

From February 5, 1998, through January 30, 2004, Mr. Scampone's decedent, his mother Madeline, was a resident of the nursing home.  On December 15, 2003, Madeline was diagnosed with a urinary tract infection ("UTI"), hospitalized, treated, and returned to the nursing home on December 18, 2003, in good condition.  Madeline was re-admitted to the hospital on January 30, 2004, and was diagnosed with another UTI as well as dehydration, malnutrition, and bed sores.  Madeline died of a heart attack at the age of ninety-four on February 9, 2004.

---

[1] Mr. Ness was dismissed by stipulation, and, at the first trial held in this matter, Grane Associates, L.P., and Trebro, Inc., were granted a compulsory nonsuit.  Mr. Scampone has never contested the grant of nonsuit in favor of those two defendants.

In this lawsuit, Mr. Scampone averred that substandard care rendered by Highland and Grane caused Madeline's dehydration, malnutrition, and second UTI and those conditions lead to her death. Punitive damages were also demanded. Mr. Scampone asserted that Grane and Highland were liable based upon theories of both vicarious liability for the actions of their employees/agents and for direct corporate liability. Vicarious liability as to Highland was based upon its employees' failure to deliver food, water, medicine, and proper medical care to Madeline from December 18, 2003 to January 30, 2004. Grane's vicarious liability was premised upon the fact that some of Grane's employees were directly involved in overseeing the care delivered to patients of the nursing home.

Direct corporate negligence was adopted by our Supreme Court as a basis for liability against a hospital in *Thompson v. Nason Hospital*, 591 A.2d 703 (Pa. 1991).[2] In the present case, direct corporate liability was

---

[2] The *Thompson* Court held that a hospital owes the following direct duties to its patients: "(1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients." *Thompson v. Nason Hosp.*, 591 A.2d 703, 707 (Pa. 1991) (citations omitted). A hospital can be subject to direct corporate negligence only if it had "actual or constructive knowledge of the defect or procedures which created the harm," and the hospital's negligence was "a substantial factor in bringing about the harm to the injured party." *Id*. at 708.

premised upon Mr. Scampone's allegations that the nursing home was chronically understaffed, Highland and Grane knew about and failed to correct the problem, and the understaffing rendered Highland employees incapable of providing appropriate care to the nursing home residents, including Madeline. Thus, Mr. Scampone averred a breach of the duty imposed on a corporation by **Thompson** to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the patients of the nursing home.

In 2007, the case proceeded to a jury trial, where Grane was granted a compulsory nonsuit at the close of the Plaintiff's evidence. Thereafter, only Highland remained as a defendant. The trial court refused to submit the issue of punitive damages to the jury, but permitted the Plaintiff's cause of action for direct corporate and vicarious liability to be submitted to the jury against Highland. The jury determined that Highland had both vicarious and direct corporate liability for Madeline's death.[3] It awarded Mr. Scampone compensatory damages in the amount of $193,500.

_____

[3] The following special interrogatories were submitted to and answered by the jury:

> QUESTION NO. 1: Do you find that [Highland] **itself** failed to oversee its nursing staff as to plaintiff's care?

> ANSWER: Yes.

*(Footnote Continued Next Page)*

## B. DIRECT APPEAL TO SUPERIOR COURT
### ("Scampone I")

Mr. Scampone appealed, and Highland cross-appealed. Therein, Mr. Scampone raised, *inter alia*, the following issues:

> I. Did the trial court commit reversible error when it granted a motion for compulsory non-suit in favor of Defendant/Appellee Highland Park Care Center, LLC, d/b/a Highland Park Care Center ("Highland Park") on Plaintiff's claim for punitive damages?

> II. Did the trial court commit reversible error when it granted a motion for compulsory non-suit in favor of Defendant/Appellee Grane Healthcare Company ("Grane Healthcare") on all of Plaintiff's claims, including his claim for punitive damages?

*Scampone v. Grane Healthcare Co.*, 11 A.3d 967, 972–73 (Pa.Super. 2010) ("*Scampone I*").

Answering these questions affirmatively, we ruled that Mr. Scampone's evidence precluded the grant of nonsuit against him as to Grane. We concluded that Grane was subject to vicarious lability for the actions of

*(Footnote Continued)* ───────────

> QUESTION 2: Do you find that [Highland] **itself** had actual or constructive knowledge of the failure you found in Question 1?

> ANSWER: Yes.

> QUESTION 3: Do you find that the conduct of the defendant's employees fell below the applicable standard of care. In other words, were the employees of the defendant negligent?

> ANSWER Yes.

N.T. Trial, 5/31/07-6/1/07 (Vol. V), at 208 (emphases added).

certain of its employees, and that Grane was subject to direct corporate liability due to the level of control it exercised over the management of the nursing home. We also held that Mr. Scampone had presented sufficient proof to establish a causal connection between the persistent understaffing at the nursing home facility and Madeline's death since the evidence supported a finding that the understaffing was a contributing factor in Highland employees' inability to deliver food, water, medicine, and medical care to Highland's patients, who included Madeline.

As to Mr. Scampone's punitive damages issue, which was premised upon actions of both Grane and Highland employees, we opined that there was sufficient evidence to establish that Grane and Highland were subject to liability for punitive damages, and we reversed the trial court's refusal to submit the question of punitive damages to the jury. Thus, we remanded for a new trial against Grane for both compensatory and punitive damages, and a new trial against Highland as to punitive damages.

In Highland's cross-appeal, Highland did not contest the jury's finding that it was vicariously liable, but it argued that a nursing home could not be subject to direct corporate liability under **Thompson**. We ruled that a cause of action for direct corporate liability could be asserted against a nursing home because a nursing home offered comprehensive medical care to its patients substantially similar to the level of care rendered by hospitals. We thus affirmed the compensatory damages award against Highland.

## C. SUPREME COURT DECISION
## ("Scampone II")

Grane and Highland filed petitions for allowance of appeal solely on the question of whether they could be found subject to direct corporate liability under **Thompson**. Our Supreme Court accepted allowance of appeal as to, "Whether the Superior Court erred in applying the corporate negligence theory, initially adopted by this Court in **Thompson v. Nason Hospital**, 527 Pa. 330, 591 A.2d 703 (1991), to a skilled nursing facility and the healthcare company responsible for its operations?" **Scampone v. Highland Park Care Ctr., LLC**, 15 A.3d 427 (Pa. 2011).

The High Court affirmed our decision, but for different reasons. It rejected the argument advanced by Highland and Grane that nursing homes and nursing home management companies were exempt from liability on a direct corporate negligence theory and that liability under **Thompson** should be limited to hospitals. **Scampone v. Highland Park Care Ctr., LLC**, 57 A.3d 582, 600 (Pa. 2012) ("**Scampone II**") (rejecting "appellants' suggestion that nursing homes and related entities should be held to be categorically immune from direct liability claims.").

Therein, the Supreme Court observed that to "prove negligence, a plaintiff may proceed against a defendant on theories of direct and vicarious liability, asserted either concomitantly or alternatively." **Id**. at 597. It continued, "Liability for negligent injury is direct when the plaintiff seeks to

hold the defendant responsible for harm the defendant caused by the breach of a duty owing directly to the plaintiff," whereas "vicarious liability is a policy-based allocation of risk," premised upon a finding of imputed negligence. *Id*. Specifically, under the theory of vicarious liability, liability is imposed based upon the relationship between the negligent actor and a party that was not negligent. If the requisite relationship, typically an employment relationship, is established between the tortfeasor and the party not directly involved in the negligent act, liability is imposed on the principal so that the victim of the tort has recourse if the responsible agent is unavailable or lacks the ability to pay. Vicarious liability is founded upon a policy decision to fully compensate the victim for the agent/employee's negligence when he or she is acting on behalf of the corporation.

*Scampone II* acknowledged that, if a corporation is the defendant, the distinction between the two types of liability can be blurred since corporations act only though its officers, employees, and other agents and thereby assume the risk of the negligence of those individuals. It nevertheless reaffirmed the notion that a corporation can be directly liable based upon a duty of care it owes directly to the plaintiff, such as "duties to maintain safe facilities, and to hire and oversee competent staff." *Id*. at 598. Our High Court observed that "the distinct theories of liability offer accountability for acts or omission of actors functioning within the complex

corporate structures" and rejected the suggestion that the two theories of liability are duplicative. *Id*. at 598.

Our Supreme Court, however, did disapprove of this Court's approach to determining when direct corporate liability can attach. It noted that under *Scampone I*, and the Superior Court cases applied therein, the decision as to whether to impose direct corporate liability pursuant to *Thompson* was focused "primarily, and occasionally exclusively, on the question of whether the entity providing medical care had assumed the role of a comprehensive health center responsible for arranging and coordinating the total healthcare of its patients." *Id*. at 605. Our High Court rejected that approach and advised that, when we determine whether a corporation is subject to direct corporate liability, we must examine the relationship between the corporation and the plaintiff. It held that "the proper question here is whether the Scampone estate offered sufficient evidence of the relationship with Highland Park, and separately with Grane Healthcare, to establish that duties of care exist, by application of Section 323 of the Restatement [2nd of Torts] or by application of the *Althaus* factors."[4] *Id*. at 606.

---

[4] *See Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166 (Pa. 2000). In that case, our Supreme Court outlined that certain factors were to be utilized in assessing whether a defendant owes a duty to the plaintiff. It observed that "the legal concept of duty of care is necessarily rooted in often
*(Footnote Continued Next Page)*

The **Scampone II** Court indicated that both Grane and Highland could not be held liable under a direct corporate negligence theory by stating: "The inquiry is individual to each appellant, although the duties of appellants may be similar. This type of individualized inquiry into appellants' duties of care ensures that multiple entities are not exposed to liability for breach of the same non-delegable duties." *Id*. at 606-07. Our High Court then observed that the trial court, as did this Court, analyzed the duty of care, as mandated by then-precedential Superior Court decisions, in terms of the nature of a nursing home's role in the total care of its residents. It directed the trial court on remand to determine whether there was a duty of care under either **Althaus** or the Restatement (Second) of Torts § 323.

In its conclusion, the Supreme Court in **Scampone II** affirmed our decision "to reverse the grant of a nonsuit with respect to Grane Healthcare,

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯⎯

amorphous public policy considerations, which may include our perception of history, morals, justice and society." *Id*. at 1169. The **Althaus** Court ruled that:

> The determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution.

*Id*.

and it affirmed the trial court's "denial of a nonsuit with respect to Highland Park." *Id*. at 607. This matter was then remanded to the trial court. The High Court directed that "the trial court's initial task upon remand is to determine, consistent with this Opinion, whether the two appellants, Highland Park and Grane Healthcare, owed Mr. Scampone legal duties and obligations and to articulate any specific duties that it may find." *Id*. It continued, "Whether a trial is then to follow will depend upon the outcome of that inquiry." *Id*. (footnote omitted)*.*

Grane never requested review of our decision that it was subject to vicarious liability, and our Supreme Court expressed no opinion on the propriety of that ruling. Likewise, any ruling on the punitive damages question was left undisturbed.

### D. PROCEEDINGS UPON REMAND BY THE SUPREME COURT

#### i. Direct Corporate Liability of Defendants

Under the Supreme Court's directive, the trial court was tasked with determining: 1) whether Mr. Scampone's evidence established the existence of a duty by Grane toward Madeline as to direct corporate liability under either *Althaus* or Restatement (Second) of Torts § 323; 2) whether Highland owed a duty of care in direct corporate liability toward Madeline under either *Althaus* or § 323; and 3) if both entities owed a duty in direct corporate liability, which one was liable under a theory of direct corporate negligence since a direct corporate negligence duty is non-delegable. The

parties briefed the issue and the trial court conducted oral argument as to the existence of a duty by Grane.

Since our Supreme Court had indicated that a new trial might not be necessary, the trial court decided that the Supreme Court's decision placed "the parties and the court back at the moment when Plaintiff closed his case in chief and Defendants moved for a compulsory nonsuit." Trial Court Opinion, 8/10/15, at 2. Grane maintains that this ruling was proper. Grane's brief at 46 ("The trial court reasonably viewed the remand order as restoring the case to the posture it held before the grant of the nonsuit.") The Plaintiff and Highland raised no objection to this decision.

The trial court thereafter reentered a "compulsory nonsuit" in favor of Grane. Trial Court Opinion, 4/9/15, at 10. It offered a variety of reasons in support of this ruling. Utilizing the **Althaus** factors, the court opined that Grane did not owe a duty to Madeline. The trial court also rejected the notion that Grane owed a duty under § 323, suggesting that "section 323 provides a cause of action only to the party to whom the promise to render services was made." **Id**. at 23. It concluded that § 324A of the Restatement (Second) of Torts did not impose liability herein since Grane had exercised reasonable care in its original undertaking, which the court stated was to provide management services to Highland and "not the care and treatment of Ms. Scampone." **Id**. at 24. The trial court additionally found that

Highland was the corporate entity with the non-delegable duty to Madeline in terms of direct corporate negligence.

### ii. Vicarious Liability of Grane

As to the issue of Grane's vicarious liability, the trial court decided that nonsuit was properly granted based upon its conclusion that there was a lack of proof that Grane caused any of Madeline's injuries. Trial Court Opinion, 8/10/15, at 2 ("I conclude that the record simply does not support the conclusion that any conduct Plaintiff alleges Grane, or Grane employees, committed caused any injury to the Plaintiff."). This finding was contrary to the holding that this Court had reached in **Scampone I**, which had remained undisturbed by **Scampone II**. However, the trial court reasoned, "I do not believe that I am bound by 'factual findings' of the Superior Court. I do not believe that the Superior Court technically makes 'factual findings.'" Trial Court Opinion, 4/9/15, at 11.

### iii. Punitive Damages Trial Against Highland

Based upon this Court's determination as to the evidentiary basis for punitive damages and award of a new trial as to Highland, the trial court conducted a new jury trial as to punitive damages solely against Highland. The jury returned a verdict in Highland's favor. Mr. Scampone filed a post-trial motion, which was denied.

### iv. Post Trial Procedural History

Mr. Scampone entered judgment on April 27, 2015, against Highland in the amount of the compensatory damages awarded by the 2007 jury, plus post-verdict interest. After Highland and Grane continually attempted to tender the amount of the judgment and Mr. Scampone refused that tender, on August 31, 2015, the trial court entered an order staying execution on the judgment and allowing Highland and Grane to pay into court the amount of the judgment entered against it.

## II. ISSUES ON APPEAL

Mr. Scampone filed two appeals from the April 27, 2015 judgment, numbers 716 WDA 2015 and 717 WDA 2015. He also filed an appeal from the August 31, 2015 order staying execution. The three appeals were consolidated for our consideration.[5] The following issues are raised herein:

> 1. Did the trial court err when it dismissed Grane Healthcare from this case for the second time?

---

[5] The appeals at numbers 716 WDA 2015 and 717 WDA 2015 are duplicative. "[O]nce a final, appealable order has been appealed, any prior interlocutory order can be called into question." *Franciscus v. Sevdik*, 135 A.3d 1092, 1093 n.1 (Pa.Super. 2016). Accordingly, in his first appeal from the judgment entered on the verdict, Mr. Scampone can raise all challenges to interlocutory rulings made prior to entry of that judgment. Hence, we dismiss the appeal filed at number 717 WDA 2015, and entertain the first appeal from the judgment entered herein. We have jurisdiction over the August 31, 2015 post-trial order because it disposed of the only outstanding matter then pending before the trial court. *Levitt v. Patrick*, 976 A.2d 581 (Pa.Super. 2009) (order is final if there is no outstanding claim pending in trial court following its entry).

2. Did the trial court err when it denied [Mr. Scampone] a new trial for punitive damages against Highland?

3. Did the trial court improperly refuse to strike Highland's answer and affirmative defenses when it refused to obey, *inter alia*, the court's discovery order?

4. Did the trial judge abuse his discretion by failing to recuse himself?

5. Did the trial court err by issuing its Order of August 31, 2015, which (a) granted Appellees' motions for leave to pay money into court; (b) prohibited Appellant from executing on the judgment entered in this case; and (c) denied Appellant's motion for sanctions and other relief?

Appellant's brief at 7-8.

## 1. WAS GRANE PROPERLY GRANTED A NONSUIT A SECOND TIME?

We initially outline our standard of review when the trial court has granted a compulsory nonsuit against a plaintiff. Nonsuit should not be granted unless it is clear that the plaintiff has not established a cause of action or any right to relief against the party in question. *Staiger v. Holohan*, 100 A.3d 622, 624 (Pa.Super. 2014) (citing Pa.R.C.P. 230.1). When we determine if the plaintiff has established the right to recover, the plaintiff "must be allowed the benefit of all favorable evidence and reasonable inferences arising therefrom, and any conflicts in the evidence must be resolved in favor of the plaintiff." *Id*. This Court will reverse an order refusing to remove a nonsuit if the trial court either abused its discretion or committed an error of law. *Id*.

Mr. Scampone's first contention is that Grane was improperly granted another nonsuit. We agree. An important observation is in order. The trial court decided to place this case procedurally as if it were back at the point when it granted nonsuit in favor of Grane at the close of Mr. Scampone's evidence at the 2007 trial, and Grane has agreed that this decision was proper. As noted, the Plaintiff does not complain that this decision was erroneous. Thus, we, as did the trial court, consider the issue in this appeal in the same context, which is whether the trial court properly granted nonsuit in favor of Grane after Mr. Scampone rested at the 2007 jury trial. This Court already has read the 2007 trial transcript and extensively set forth that proof in **Scampone I** and, as noted, the trial court re-entered nonsuit in favor of Grane based upon that same evidence. Thus, this panel will recite the proof relied upon by **Scampone I**.

### A. Evidence Proffered by the Plaintiff at Trial

The management agreement between Grane and Highland required Grane to, "Establish and administer a quality assurance program to assure the facility [Highland] provides quality nursing services to its residents." N.T. Trial Vol. III, 5/21–24/07, at 623. Grane further was charged with management of "all aspects of the operation" of Highland. **Id.** Highland set staffing levels, but Grane had budget approval over staffing levels.

There were three shifts each day at the nursing home: 7:00 a.m. to 3:00 p.m., 3:00 p.m. to 11:00 p.m., and 11:00 p.m. to 7:00 a.m. The staff

at the facility included registered nurses ("RN"), licensed practical nurses ("LPN"), and certified nursing assistants ("CNA"). An RN performed the initial assessment for each new incoming patient, drew blood, administered intravenous medications and narcotics, reported critical problems to doctors, and oversaw the LPNs. The RNs also received various daily reports, which are discussed in more detail, *infra,* about each patient.

LPNs administered oral medications, other than narcotics, and changed dressings. CNAs performed the remainder of the functions needed by the residents; these functions are known as activities of daily living and consist of anything that a resident is unable to independently perform. Examples of activities of daily living include bathing, feeding, supplying water, changing diapers, and transportation to different areas for therapy or recreation. ***See*** N.T. Trial Vol. II, 5/14–18/07, at 57–118. There were supposed to be two LPNs and four CNAs on the 7:00 a.m. to 3:00 p.m. shift, and two LPNs and three CNAs on the other two shifts. ***See id***. at 282.

Each floor had approximately 145 patients and one RN, who was the unit manager. There also was one nursing supervisor who oversaw the entire facility; that person was known as the assistant director of nursing or the RN supervisor. After the daily reports were submitted to the RN unit manager, she or he conveyed them to the nursing supervisor, who also was responsible for calling in additional staff if the nursing home did not have sufficient employees on a given shift. Independent agencies were available

to provide temporary help. The Director of Nursing ("DON"), who was an RN, was the direct supervisor of the assistant director of nursing. Grane hired and trained all of the RNs. In addition, Grane employed a nurse consultant who visited Highland weekly and oversaw the quality of patient care at the nursing home.

The CNAs were required to complete reports for each patient on each shift. These charts were to include all activities of daily living (these charts will be referred to as "ADLs") that the CNA conducted for each patient. Another report was called a Medication Administration Record ("MAR") and was completed for all medications given to a patient. Finally, there was a twenty-four-hour report. Since it was impossible to complete every service required by each patient in any given shift, if something a patient needed was not accomplished during a shift, that task was placed on the twenty-four-hour report so that the next incoming RN unit manager would ensure its completion.

Danny Toledo had a B.S. in nursing and was an RN unit manager who worked at Highland from 2002 to 2004. Mr. Toledo testified that, during his tenure at Highland, he was never able to complete the activities that he was tasked to perform. Mr. Toledo specifically requested assistance with intake assessment. He explained that most admissions occurred from 1:00 p.m. to 9:00 p.m., and he asked that an additional RN work each day during that time frame to handle assessments. That request was refused.

Mr. Toledo also reported that he received "many complaints" about not having enough CNAs. *Id.* at 85. CNAs specifically informed him that they did not have sufficient time to give patients water and to respond to call lights. *Id.* at 87. There were delays in feeding, and patients also were not administered their medications, nor were they able to reach their water. *Id.* at 106–09. Mr. Toledo testified that the facility did not have enough "helpers to take care of the residents more than three times a week." *Id.* at 101.

In addition, ADLs were not being completed. Mr. Toledo explained that omissions in the ADLs were significant because it was important to know a patient's intake of fluids and food. *Id.* at 111. Patients were not receiving the state-mandated number of care hours that they were supposed to receive because there was less staff on evening and night shifts. *Id.* at 174.

State surveys were conducted periodically to inspect the facility and ensure that proper patient care was being performed. Mr. Toledo related during direct examination that Highland avoided state sanctions for understaffing because it had advance notice of state inspections and would temporarily increase staff levels during those time periods.

Mr. Toledo complained to the assistant director of nursing and to the director of nursing, Kim Luzik, and also to the nursing home administrator, Bernard Erb. *Id.* at 100–01. Mr. Toledo said he relayed all the complaints

that he heard to his supervisors. *Id.* at 100. Specifically, "there was a stand-up meeting every morning in the first floor conference room with all the directors, with all the DONs [directors of nursing] in the facility." *Id.* at 101–02. Without discussing private patient matters, they would "go through what happened the day prior and what was the plan for the next day, and if something would happen some incident like that, then it would get reported to everybody." *Id.* at 102. Present at those meetings were RN unit managers, the assistant director of nursing, the director of nurses, the nursing home administrator, and other staff members. *Id.* at 102. Mr. Toledo stated that Ms. Luzik, the DON, was aware of the incomplete ADLs. *Id.* at 112. Finally, Mr. Toledo confirmed that he knew Madeline and had worked in her unit during his tenure at the facility.

Mr. Toledo reported that Grane hired and trained him and that his clothing said, "Grane Healthcare Company." *Id.* at 165. He further related that Grane provided "the policies and procedures that you were supposed to follow at the facility." *Id.* Finally, the nurse consultant worked for Grane.

Mr. Toledo delineated that when he worked at Highland, two nurse consultants, Beth Lengle and Tammy Payne, came to the facility to make "sure that everything was taken care of and to do surveys on the chart and to make sure that the staff was doing what they were supposed to be doing." *Id.* at 176. Mr. Toledo testified that Ms. Payne "would go through the charts, make sure that policies and procedures were getting done

correctly and the staff was assigned to what they were supposed to do and follow recommendations." *Id.* at 176. Mr. Toledo informed the jury that the purpose of the nurse consultant was to oversee the care being provided to the residents. *Id.*

Evelyn Johnson worked at Highland as a CNA from 2001–02 and then earned her LPN. She worked as an LPN at Highland from 2002–06. When she started working for the nursing home, Highland ran the facility. Then, "Grane bought it or took it over. It was Grane's facility. All services and everything was Grane." *Id.* at 292. Grane implemented the policies and procedures and operated the facility by 2004, when Madeline's negligent care was rendered.

In 2003 and 2004, Ms. Johnson served as the fourth floor LPN from 7:00 a.m. to 3:00 p.m. She was responsible for thirty-eight to forty residents, and had difficulties completing her job assignments. She informed DONs Kathy Euwer and Kim Luzik about the problem, but nothing was done. *Id.* at 285. Ms. Johnson confirmed Mr. Toledo's testimony that there was additional staff placed on duty when state surveyors came to inspect and after those inspections were completed, the staffing levels were once again reduced. *Id.* at 286. Ms. Johnson, who also indicated that the CNAs were supposed to pass water to the residents, was aware that sometimes that did not occur. When she worked on the fourth floor at Highland, the ADLs were incomplete. *Id.* at 289. Furthermore, Ms. Johnson

was instructed by Highland's administrator to "fill in the holes" in the ADLs when the state supervisor was due to arrive. *Id.* at 291. She personally saw other people filling in gaps in the ADLs. *Id.* Ms. Johnson also testified that any omissions in the MARs were completed prior to state inspections and that she was forced to sign MAR documents indicating that medications had been given when they had not. *Id.* at 293.

Karrin Holmes was a CNA who worked at Highland from 2003 until 2005. She helped care for Madeline from time to time and noticed untaken pills in her room. Ms. Holmes stated that the water pitcher was "always empty." *Id.* at 353. She confirmed that she was not able to do all the necessary functions for patients because there were not "enough CNAs." *Id.* at 356. Ms. Holmes reported that the ADLs were not always complete, and that she had been instructed by Grane nurse consultants Beth Lengle and Tammy Payne to fill in blanks in the ADLs. *Id.* at 359–60. Ms. Holmes also stated that Highland would increase staffing temporarily when state surveyors came to inspect the facility. *Id.* at 362. She complained about the understaffing of CNAs "through the chain of command." *Id.* at 365.

Zenobi Scott was employed as a CNA at Highland from 2003 through 2004, and rendered care to Madeline. He was unable to perform his tasks, including, at times, filling water pitchers. *Id.* at 41. Mr. Scott explained that "you didn't have enough staff to provide sufficient care." *Id.* at 417. He reported the problem at staff meetings when DON Kim Luzik, was

present. Despite reassurances, the problems were not addressed. *Id.* at 433. Mr. Scott also reported that when "the state came in, the staffing was increased[.]" *Id.* at 418. He recalled that, when there were blanks in the ADLs, he was told to falsify the records and fill in the omissions. *Id.* at 419.

Christine Kopyleck was an LPN who was trained by Grane to treat pressure wounds and who worked at Highland from 2001 to 2003. Tammy Payne, who was a nurse consultant employed by Grane, was at the facility each week. Ms. Kopyleck testified that the CNAs complained to Ms. Payne "a lot" about the fact that "[t]here wasn't enough of them for the amount of residents that we had." *Id.* at 472. Ms. Kopyleck confirmed that there were always additional staff when the state inspectors arrived and, after the inspections, the staffing levels would be reduced to normal. She also reported that omissions in MARs as well as treatment sheets would be completed. She complained to her superiors about omissions in the reports and observed un-administered medications in the rooms of fourth-floor patients. She would check the MARs and those documents indicated that the medications "were given." *Id.* at 480.

Karolyn Knowlton was an RN who worked for Highland in 2003 and 2004 and left as a career move. She specialized in long-term care and stressed the importance of initial and periodic assessments of patients to evaluate needed therapies and levels of care. The assessments identified patient risks and were used to develop a plan to ensure proper patient care.

She stated that ADLs were critical in determining whether the patient's existing plan was sufficient to meet his or her needs or whether an updated assessment and plan needed to be implemented. When she worked at Highland, Ms. Knowlton actually saw Grane employees, Kathy Euwer and Tammy Payne, "sitting together with some of the records, and they were going back to the beginning of the month and putting their initials . . . in some empty spots on the documents" to signify treatment that had not been performed had been. *Id.* at 507, 508. The documents being altered were treatment records, and Ms. Knowlton reported the incident to Bernard Erb, the administrator. Additionally, Ms. Knowlton heard complaints from staff who did not have sufficient time to provide the care needed by the patients. *Id.* at 513. She also passed this information along to Mr. Erb, Kathy Euwer, and Kim Luzik.

Through the testimony of Ed Francia, who was an administrator at Highland, Mr. Scampone established that Grane approved the budget for the nursing home and that anything remaining in Highland's bank account at the end of the month was swept into an account owned by Grane. *Id.* at 749–50. He confirmed that Grane employed the nurse consultants who were responsible for quality control and for ensuring staff members were performing their required functions at the facility. Bernard Erb, another administrator at the nursing home, stated that Leonard S. Oddo, who worked for Grane, was Mr. Erb's "boss." N.T. Trial Vol. III, 5/21–24/07, at

301. Mr. Erb confirmed that Grane was both aware of and had budgetary approval over staffing levels at Highland. *Id*. at 233–37.

Grane's nurse consultants, who visited Highland weekly and who were charged with ensuring that patients received proper care, had been repeatedly informed by Highland personnel that they lacked sufficient staff to perform those functions that patients required for proper care. The nurse consultants did not initiate an increase in staffing and were involved, together with Highland employees, in falsifying patient reports to reflect that care was provided when it was not. Grane appointed the DONs, and hired and trained the RNs.

Mr. Scampone proffered Kathleen A. Hill–O'Neill as an expert witness as to nursing home liability. N.T. Trial Vol. III, 5/21–24/07, at 5. Ms. Hill–O'Neill testified as follows regarding the care rendered to Madeline after she was returned to Highland on December 18, 2003, from her in-patient hospital stay for a UTI. She opined, within the bounds of reasonable nursing certainty, that the care rendered to Madeline fell below the standard of care for a nursing home in Pennsylvania with regard to monitoring, assessing and preventing dehydration; monitoring, assessing and preventing infections; monitoring, assessing and preventing malnutrition; responding appropriately to significant changes in her condition; and maintaining an appropriate clinical record for her.

Ms. Hill–O'Neill specifically recounted the following. During November 2003, there was no record regarding Madeline's fluid intake, and a UTI test that was ordered by a doctor on November 21, 2003, was not performed. Madeline was admitted to the hospital on December 15, 2003, hallucinating and with a UTI, and was returned to Highland on December 18, 2003, with her mental baseline intact. Madeline was reassessed and was completely oriented as to time and place. On December 31, 2003, Madeline's doctor ordered another UTI test, but it was not performed. By January 7, 2004, Madeline started to display signs of confusion, which is a symptom, *inter alia*, of dehydration. This acute change in condition should have triggered monitoring, which was not performed. Rather, there were no nursing notes for a nineteen-day period, between January 7, 2004 and January 26, 2004. On January 29, 2004, Madeline was crying for water. Meanwhile, it was important that Madeline be monitored for water intake due to her UTI. After she was discharged from the hospital to the nursing home on December 18, 2003, Madeline also experienced a significant weight loss.

Mr. Scampone's other expert witness was Dr. Dean J. Nickles, a doctor of internal medicine who had cared for patients at nursing homes for twenty-six years. Dr. Nickles testified that the standard of care as to Madeline was not met when the ordered UTI testing was not performed. Additionally, the monitoring, assessing, and interventions and actions to prevent dehydration and infections and to ensure adequate nutritional intake were substandard.

Dr. Nickles also reported that, within the bounds of reasonable medical certainty, the standard of care was not met as to observing, monitoring, and responding to significant changes in Madeline's condition. He opined that appropriate records were not kept. He linked these deficiencies to her death, stating that the failure to diagnose and treat the UTI and dehydration were contributing factors in Madeline's death.

**B. Has a Cause of Action Against Grane Been Established?**

Recall that the trial court, after remand from the Supreme Court, concluded that Grane had no duty to Madeline under **Althaus**, § 323 of the Restatement (Second) of Torts, or § 324A of the Restatement (Second) of Torts. Initially, we note that the Supreme Court issued a decision after **Scampone II** that appears to render an **Althaus** analysis unnecessary. Specifically, in **Alderwoods (Pennsylvania), Inc. v. Duquesne Light Co.**, 106 A.3d 27 (Pa. 2014), our Supreme Court revisited and refined whether an **Althaus** inquiry must be conducted in the first instance.

In that case, the plaintiff owned a building containing a funeral home that was served by the defendant, a public electrical utility company. As a result of a car crash, a utility pole directly connected to the funeral home was damaged. The electric company made repairs, but shortly thereafter, a fire ignited near an electrical panel box in the building's basement, and the funeral home was destroyed.

The plaintiff instituted a negligence action against the utility company. It produced the report of an expert witness, who opined that high voltage and low voltage lines crossed during the incident, causing a short-circuit in the electrical system of the funeral home and damaging it. The expert witness concluded that the defendant's employees knew or should have known of the damage to the interior of the funeral home's electrical system and should have contacted the plaintiff for an interior inspection before restoring power to the building.

The electric company countered that it did not have a duty to inspect the privately-owned electrical equipment of the funeral home, or of any private customer for that matter, before restoring power after an outage. The electric company contended that the service point established a line of demarcation between the responsibilities of an electric service provider and the customer so that any electrical failure occurring on the customer's side was the customer's responsibility. The plaintiff responded that the electric company had a duty, sounding in general negligence, as outlined in Restatement (Second) of Torts § 302. That section provides that, if someone performs an affirmative act, the person has a duty to exercise the care of a reasonable man to protect against an unreasonable risk of harm to others arising out of the act. Restatement (Second) of Torts § 302, cmt. a ("In general, anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable man to protect them against an

unreasonable risk of harm to them arising out of the act."). The funeral home also argued that **Althaus** created a duty of care.

The trial court granted summary judgment to the electric company, concluding that it did not have a duty to inspect equipment owned by its customers. The Superior Court, utilizing an **Althaus** analysis, reversed and found that the funeral home established a duty against the defendant. Our Supreme Court then accepted the electric company's request for review.

The **Alderwoods** Court found that "the service-point rule has its limits and does not wholly supplant the salient common-law duty" because the service-point paradigm did not take into account "the presence of actual or constructive knowledge, on the part of utilities engaged in affirmative activities proximate to customer premises, of an unreasonable risk of harm arising from their conduct." **Alderwoods**, **supra** at 38. Our High court continued: "As to the aspects of this litigation centered on the **Althaus** factors, we find these to be more relevant to the creation of new duties than to the vindication of existing ones. It is not necessary to conduct a full-blown public policy assessment in every instance in which a longstanding duty imposed on members of the public at large arises in a novel factual scenario." **Id**. at 40. It held, "Common-law duties stated in general terms are framed in such fashion for the very reason that they have broad-scale application." **Id**. at 40-41. Thus, **Alderwoods** indicates that if a common

law duty exists under the Restatement (Second) of Torts, the **Althaus** analysis is not necessary.

In the present case, we find that Restatement (Second) of Torts §§ 323 and 324A, which have been adopted in Pennsylvania, apply, and that the **Althaus** analysis is superfluous. Restatement (Second) of Torts § 323, negligent performance of an undertaking to render services, imposes a duty upon Grane under the proof presented by Mr. Scampone. That section provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323.

Our Supreme Court long ago adopted this duty in **Evans v. Otis Elevator Co.**, 168 A.2d 573 (Pa. 1961). Evans was employed as a stock clerk by a tobacco company and was struck on the head with a board while using the freight elevator. He filed suit against Otis and averred that it was negligent in failing to properly inspect the elevator and to notify Evans or his employer of its defective and dangerous condition. The jury entered an award against Otis and in favor of Evans, and the award was affirmed.

Our High Court rejected Otis' position that it did not owe a duty to Evans. Otis and Evans' employer had entered an agreement wherein Otis agreed to examine and maintain the freight elevator twice a month. Otis argued that the agreement failed to impose a duty on it as to Evans, a nonparty to the accord. Our High Court disagreed stating, "a party to a contract by the very nature of his contractual undertaking may place himself in such a position that the law will impose upon him a duty to perform his contractual undertaking in such manner that third persons – strangers to the contract – will not be injured thereby; Prosser, Torts (2nd ed. 1955), § 85, pp. 514-519." *Id*. at 575.

The **Evans** Court continued that it was not necessarily that the contract created a duty, but "the law which imposes the duty because of the nature of the undertaking in the contract." *Id.* Our High Court continued, "If a person undertakes by contract to make periodic examinations and inspections of equipment, . . . he should reasonably foresee that a normal and natural result of his failure to properly perform such undertaking might result in injury not only to the owner of the equipment but also to third persons, including the owner's employees." *Id*. at 575-76.

The **Evans** Court thus adopted the duty outlined in § 323. **See also Feld v. Merriam**, 485 A.2d 742, 746 (Pa. 1984) (Restatement (Second) of Torts § 323 has been adopted "as an accurate statement of the law in this Commonwealth."); **accord Bruno v. Erie Ins. Co.**, 106 A.3d 48, 69 (Pa.

2014) ("our Court has long recognized that a party to a contract may be found liable in tort for negligently performing contractual obligations and thereby causing injury or other harm to another contracting party"). We observe at this point that, in light of the *Evans* decision, it is clear that the trial court committed legal error when it stated: "Section 323 provides a cause of action only to the party to whom the promise to render services was made." Trial Court Opinion, 4/9/15, at 23.

The following facts presented by Mr. Scampone establish the existence of a duty by Grane to Madeline under § 323. There was an executed management agreement between Grane and Highland that required Grane to manage all aspects of the operation of Highland, establish and administer a quality assurance program, and ensure that the nursing home facility provided quality nursing services to its residents. Specifically, the management agreement between Grane and Highland required Grane to, "Establish and administer a quality assurance program to assure the facility [Highland] provides quality nursing services to its residents." N.T. Trial Vol. III, 5/21–24/07, at 623. Grane further was charged with management of "all aspects of the operation" of Highland. *Id.* Highland set staffing levels, but Grane had budget approval over staffing levels.

Grane hired and trained all of the RNs, and a Grane nurse consultant visited Highland weekly and directly oversaw patient care delivered at the facility. The nurse consultant reviewed the various reports outlining the care

patients received.  Additionally, Grane created and disseminated the policies and procedures for the nursing home facility, and it approved of the budget for the nursing home.  Moreover, the administrator of the nursing home was subject to the supervision of a Grane employee.  Thus, Grane was contractually responsible for the management of care provided by the nursing home.  Grane employees, the nurse consultants, had a direct hand in the care provided to nursing home residents during the weekly visits and review of the patient care provided by Highland employees. To summarize, Mr. Scampone's witnesses reported that, by 2004, Grane took over and operated the nursing home and implemented the policies and procedures.[6]

Additionally, Mr. Scampone, after the 2007 trial, uncovered a policies and procedures manual that Grane created for the nursing home facility. That manual demonstrated the prominence of Grane's actual role in overseeing the operations of the facility.  For example, the manual indicated that Grane provided the facility's nursing services, as evidenced by its hiring of RNs, outlined that Grane was to be notified of incidents and problems that transpired with resident care, and included rules and regulations about how the facility should operate.  The manual confirmed the testimony of Mr.

---

[6] It bears repeating that Grane was the parent company, and Highland, a subsidiary, which actually owned the nursing home in question.  Highland entered into a management agreement with its parent company, Grane, which assumed the responsibility to manage it.

Scampone's witnesses that Grane disseminated the policies and procedures for the nursing home and was in charge of quality control.

In conclusion, Grane contractually undertook to render services to residents of Highland's nursing home by managing the care provided to them and by overseeing the operations of the facility, and Grane should have recognized those services were necessary for the protection of those elderly and infirm residents. It is subject to liability for any physical harm resulting from its failure to exercise reasonable care in the performance of this undertaking. Since Grane had a duty of care toward Madeline under § 323, we need not examine **Althaus**. **Alderwoods**, **supra**.

We also agree with the Plaintiff that Grane had a duty pursuant to Restatement (Second) of Torts § 324A, which was adopted in **Cantwell v. Allegheny Cnty.,** 483 A.2d 1350 (Pa. 1984); **see Barnes v. Alcoa, Inc.**, 145 A.3d 730, 736 (Pa.Super. 2016). That section provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary **for the protection of a third person** or his things, is subject to liability **to the third person** for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> > (a) his failure to exercise reasonable care increases the risk of such harm, or
> >
> > (b) **he has undertaken to perform a duty owed by the other to the third person**, or

> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (emphases added).

Grane agreed to manage medical and patient care services rendered to the residents of a nursing home, which it should have recognized as necessary for their protection. If a jury finds, based upon the evidence of negligence and causation presented, that Grane failed to exercise reasonable care in this undertaking and its failure to ensure proper patient care increased the risk of harm caused to Madeline or that it undertook to perform a duty owed by Highland to Madeline, then the Plaintiff can recover, and entry of a nonsuit was improper.

The trial court indicated that liability did not attach under § 324A of the Restatement (Second) of Torts since Grane had exercised reasonable care in its original undertaking, which was to provide management services to Highland, "not the care and treatment of Ms. Scampone." *Id*. at 24. First, whether Grane exercised reasonable care in managing the facility was a question for the jury to determine. There was sufficient proof that Grane did not manage the facility in a reasonable manner as the Plaintiff adduced proof that the nurse consultants were told that there was insufficient staff to properly care for the nursing home residents. Yet, according to the Plaintiff's evidence, nothing about the staffing was done by Grane, which was charged with oversight and management of patient care. Secondly, it is

- 36 -

irrelevant whether Grane contracted to care for and treat Madeline.  The proper inquiry is whether Grane should have recognized that its contractual undertaking to **manage and oversee** the care and treatment of Madeline was necessary for her protection.  It should have so recognized this fact.

### C. Was There Evidence of Causation?

In addition to finding no duty against Grane, the trial court also opined that there was no evidence of causation, as a further basis for its grant of nonsuit.  This court previously addressed this issue in ***Scampone I***, finding evidence of causation.  The trial court stated that it was not required to accept our ruling that there was sufficient evidence to support the jury's conclusion that Grane's acts and omissions caused Madeline's injuries.  In so doing, the trial court concluded that we had engaged in "fact-finding" in our prior appeal.  In ***Scampone I***, we were addressing whether the trial court properly granted a nonsuit to Grane.  Recall that a nonsuit can be granted only if, "**viewing the evidence and all reasonable inferences arising from it in the light most favorable to the plaintiffs**, the elements of a cause of action against the defendant have not been established." ***Barnes v. Alcoa, Inc.***, 145 A.3d 730, 735 (Pa.Super. 2016) (emphasis added).  In other words, any court, in granting a nonsuit, must accept the plaintiff's evidence as true and analyze whether it establishes the existence of a duty and causation by the defendant.

Thus, we did not, to any extent, engage in fact finding in *Scampone I*. Rather, we simply examined the evidence presented by Mr. Scampone in the light most favorable to Mr. Scampone, as plaintiff, in order to ascertain whether that proof made out the existence of a cause of action in vicarious liability against Grane. If we accept Mr. Scampone's evidence presented at the 2007 trial as true, as we must, Mr. Scampone adduced sufficient proof to establish a causal connection between the actions of Grane and Madeline's death. As extensively outlined in *Scampone I*, Mr. Scampone's witnesses linked substandard care rendered to Madeline at the nursing home as the proximate cause of her death. Specifically, Mr. Scampone presented an expert witness who "clearly opined that the nursing home's failures led to Madeline's untreated U[T]I, dehydration, and malnutrition, and she was competent to testify about the standard of care applicable to nursing homes and that the deviation from the standard was the cause of Madeline's condition." *Scampone I*, *supra* at 988. We also observed that "a doctor who was competent to testify regarding the matter, stated that the U[T]I, dehydration, and malnutrition were contributing factors in Madeline's death." *Id*.

In addition, Mr. Scampone proffered evidence that Madeline was not given food, water, and a doctor-ordered test, and was not properly monitored in the days preceding her death, and that this malfeasance caused her death from a UTI and lack of food and water. Mr. Scampone's

proof demonstrated that Highland employees were responsible for this substandard care as they did not administer food and water or monitor and test Madeline for infection. Nevertheless, Plaintiff also adduced evidence that, during the pertinent time frame herein, the nurse consultants, Grane employees, who were responsible for managing the nursing home and insuring quality-of-care, were aware that Highland's staff routinely failed to give water, medicine, and appropriate care to the patients because the nursing home facility was chronically understaffed. A jury could find that lack of sufficient staff was a contributing factor in the pervasive improper care and Madeline's death. A jury question was presented as to causation by Mr. Scampone's proof, and nonsuit was improperly granted by the trial court on this ground as well.

### D. Can the Plaintiff Recover from Grane in light of its verdict against Highland?

As noted, the trial court found that Highland was subject to liability in direct corporate negligence as Highland had a non-delegable duty to render proper care to Madeline by virtue of its direct contractual relationship with her, the fact that it was the licensed owner of the nursing home facility, and due to its direct rendition of care services to its residents. We agree. As the licensed owner and occupier of the nursing home facility and, by virtue of its direct contractual relationship with Madeline to render her care, Highland could be subject to any applicable non-delegable duty for a cause of action

in direct corporate negligence as outlined in **Thompson**. In this particular instance, as affirmed by **Scampone II**, the owner or manager of a nursing home is subject to direct corporate liability and has a non-delegable duty to formulate, adopt, and enforce adequate rules and policies to ensure quality patient care. Highland contractually assigned responsibility for that duty to Grane. Systemic understaffing that prevents personnel from delivering essential services such as delivery of food, water, medicine, and ordered medical testing, if a jury so determines, can be a violation of that duty, which was the duty implicated in this case. **Hyrcza v. W. Penn Allegheny Health Sys., Inc.**, 978 A.2d 961, 984 (Pa.Super. 2009) (instruction on direct corporate liability warranted where evidence established that defendant "failed to deliver the comprehensive care it was contractually obligated" by providing a doctor to oversee a patient's care).

As this Court has observed, the designation "non-delegable duty" is a misnomer. **Kennedy v. Robert Morris Univ.**, 133 A.3d 38, 44 (Pa.Super. 2016). A principal can always delegate or assign its performance of a non-delegable duty. The term "non-delegable duty" merely means that the principal retains legal responsibility for the undertaking of the person/entity to which the principal assigned the non-delegable duty if the entity acted negligently. **Id**. The 2007 jury found that Highland was vicariously liable for negligent acts of its employees and had direct corporate liability for

failure to properly oversee its staff. *Cf. id*. Thus, Highland retained legal responsibility for Grane's undertaking of Highland's non-delegable duty. *Id*.

However, this conclusion does not mean that Grane should have been granted another nonsuit. Apparently, the trial court concluded that, if Highland was subject to liability for direct corporate negligence, Grane could be dismissed. This conclusion completely overlooked the Plaintiff's alternative basis for imposing liability on Grane: vicarious liability.

The *Scampone II* opinion plainly outlined that direct corporate liability and vicarious liability are distinct bases for recovering against a corporate defendant and that liability for one did not obviate liability for the other. Indeed, direct corporate liability was designed to expand a plaintiff's ability to recover against a corporation and does not supplant vicarious liability imposed on a corporation for the acts and omissions of its employees. Thus, the fact that Highland had a non-delegable duty under *Thompson* in direct corporate liability to render appropriate care toward Madeline did not mandate the automatic dismissal of Grane as a defendant herein.[7] Grane's liability attaches under § 323 and § 324A. It contractually

_____

[7] We do note our disagreement with Mr. Scampone's characterization of Grane's dismissal as *sua sponte*. The case was remanded to determine whether Grane had a duty of care toward Madeline. The trial court, albeit incorrectly, decided that Grane did not have a duty of care in this action. We also note that Mr. Scampone does not take issue with the trial court's conclusion that Highland had direct corporate liability herein.

agreed to oversee and ensure that proper care was given to Highland's patients. There was sufficient proof adduced that, if credited, the actions of Grane employees, its nurse consultants, rendered Grane vicariously liable in this lawsuit. **Scampone I**, **supra** at 990 ("In this case, Grane is subject to vicarious liability for the acts and omissions of its agents regarding the quality of care rendered to patients at Highland. . . . The nursing consultants [,Grane employees,] were involved in the daily care of Madeline in that the consultants ensured that the . . . staff was carrying out its duties.").

Grane's duty toward Madeline was voluntarily assumed by its contract with Highland. Under the agreement, Grane was responsible for overseeing and ensuring quality patient care. Madeline's ability to seek relief against Grane is premised upon the Plaintiff's assertion that Grane was vicariously liable for the acts and omissions of its employees in performing Grane's contractual responsibilities. The fact that Highland was liable in direct corporate negligence for Grane's alleged misfeasance does not serve to absolve **Grane** from the duty of care it assumed by virtue of § 323 and § 324A. Grane remains exposed to liability in this case because, according to Mr. Scampone's proof, its employees did not perform Grane's duty in a reasonable manner, increasing the risk of the harm actually suffered by Madeline. Madeline certainly relied upon Grane's undertaking to manage the facility to ensure proper patient care, whether or not she knew that Highland had assigned the responsibility for overseeing patient care to Grane.

When returning this case back to the middle of trial in the nonsuit phase, the trial court incorrectly focused **solely** on the issue of direct corporate liability against Grane and Highland. While, under **Scampone II**, both entities cannot have direct corporate liability for performance of the same non-delegable duty imposed by **Thompson**, resolution of that singular question did not impact on the question of whether Grane was subject to vicarious liability herein.

Mr. Scampone's position, which he consistently maintained throughout this lawsuit, was that Grane owed a duty of care toward Madeline by virtue of its agreement to manage and oversee the quality of care rendered at the facility.[8] Grane is vicariously liable based on the acts and omissions of its employees, the nurse consultants, in overseeing Highland staff and failing to ensure that the nursing home's patients received appropriate care.

**Scampone II** did not impact upon our determination that Grane was subject to vicarious liability due to the actions of its employees. Indeed, our High Court noted that vicarious lability and direct corporate liability were

_____

[8] We reject any notion that Mr. Scampone has waived his contention that Grane is subject to vicarious liability in this case. **See** Grane's brief at 50, n. 16. The Plaintiff sought imposition of vicariously liability against Grane at the 2007 trial, this Court found that Grane was subject to such liability, and Grane did not seek allowance of appeal on that question to the Supreme Court, which concomitantly did not address the issue of Grane's vicarious liability. After remand, Mr. Scampone asserted that Grane had a duty of care and that our ruling on Grane's vicarious liability was law of the case.

distinct theories of recovery. As the above-delineated evidence reflects, the RNs, LPNs, and CNAs were employed by Highland, and they provided the direct care needed by Madeline. Nevertheless, the Plaintiff's evidence also revealed that the nurse consultants, who were Grane employees, were supervisory personnel on site at the facility weekly, and were responsible for ensuring that the Highland staff performed properly in terms of patient care. The nursing consultants were involved in the daily care of patients, including Madeline, as they visited the facility to ensure that the Highland staff was carrying out its duties and that Highland's patients were receiving appropriate care. Those Grane employees also reviewed the daily reports of the care provided to each patient. Indeed, Grane's nursing consultants, according to the evidence we are required to accept for purposes of a nonsuit, were involved in falsifying reports by indicating that Highland staff was giving patients care that was not actually rendered. Thus, Grane had an *in situ* direct supervisory role in the hands-on care rendered to Madeline.

According to Mr. Scampone's proof, Grane's nursing consultants failed to supervise the staff properly because the nurse consultants knew, and did nothing about the fact, that Highland staff did not provide nursing home residents proper fluid, testing, nourishment, and medication. As we observed in **Scampone I**, Mr. Scampone linked these deficiencies to Madeline's death since the Plaintiff's proof was sufficient for a jury to find that insufficient staffing levels was a contributing factor in the inability of

Highland employees to provide proper care to nursing home residents. Nothing in the **Scampone II** decision alters our conclusion that Grane was subject to vicarious liability.

### E. Shared Liability

This case implicates the unremarkable situation where two tortfeasors are subject to liability for the same harm. In **Neal v. Bavarian Motors, Inc.**, 882 A.2d 1022 (Pa.Super. 2005), both a car dealership and financing company were found liable to the plaintiff because she bought a stolen car. The dealership sold the plaintiff the car, and the sale was financed by the financing company. The jury found that both the dealership and the financing company knew or should have known that the car was stolen, and awarded damages, which the trial court imposed jointly and severally against both defendants.

On appeal, the financing company contested the trial court's imposition of joint and several liability upon it and the car dealership for the damages suffered by the plaintiff. We rejected that position. Rather: "If the tortious conduct of each of two or more persons is a legal cause of harm that cannot be apportioned, each is subject to liability for the entire harm, irrespective of whether their conduct is concurring or consecutive." Restatement (Second) of Torts § 879. Under Restatement (Second) of Torts § 433A, damages for harm is to be apportioned among two or more causes if "(a) there are distinct harms, or (b) there is a reasonable basis for

determining the contribution of each cause to a single harm." However, under section 433A, "Damages for any other harm cannot be apportioned among two or more causes." Restatement (Second) of Torts § 433A(2).

The *Neal* court observed that these two Restatement sections, which have been adopted in Pennsylvania, mean that, "If two or more causes combine to produce a single harm which is incapable of being divided on any logical, reasonable, or practical basis, and each cause is a substantial factor in bringing about the harm, an arbitrary apportionment should not be made." *Id*. at 1028. This Court noted that "[m]ost personal injuries are by their very nature incapable of division" and that when "the tortious conduct of two or more persons causes a single harm which cannot be apportioned, the actors are joint tortfeasors even though they may have acted independently." *Id*. We observed that the record in that case established that the dealership and financing company acted in concert to facilitate the sale of the stolen vehicle to the plaintiff. We affirmed the trial court's imposition of joint and several liability on the two defendants.

This decision aptly describes what occurred herein. According to Mr. Scampone's proof, both Highland staff and Grane employees were jointly involved in the care rendered to Madeline. Highland staff delivered that care directly by supplying, or failing to provide, as this case demonstrates, Madeline's food and water and medicine and obtaining tests while Grane staff supervised that care and were aware of insufficient staffing levels.

Deficient staffing levels, according to the Plaintiff's evidence, was a contributing factor *vis a vie* Highland's personnel's inability to provide the care required by Madeline.

### F. Scope of Grant Of New Trial

We award a new compensatory damages trial against Grane. When the negligent conduct at issue occurred and when this action was tried in 2007, the law in existence at that time provided that each tortfeasor was jointly and severally liable for the entire verdict, as follows:

> Recovery against joint defendant; contribution. Where recovery is allowed against more than one defendant, each defendant shall be liable for that proportion of the total dollar amount awarded as damages in the ratio of the amount of his causal negligence to the amount of causal negligence attributed to all defendants against whom recovery is allowed. **The plaintiff may recover the full amount of the allowed recovery from any defendant against whom the plaintiff is not barred from recovery.** Any defendant who is so compelled to pay more than his percentage may seek contribution.

42 Pa.C.S.§ 7102(d)(repealed).[9]

---

[9] The fair share rule replaced the provision that a defendant is liable for the entire verdict if the defendant is found liable to any extent:

**Recovery against joint defendant; contribution.**--

(1) Where recovery is allowed against more than one person, including actions for strict liability, and where liability is attributed to more than one defendant, each defendant shall be liable for that proportion of the total dollar amount awarded as damages in the ratio of the amount of that defendant's liability

*(Footnote Continued Next Page)*

to the amount of liability attributed to all defendants and other persons to whom liability is apportioned under subsection (a.2).

(2) Except as set forth in paragraph (3), a defendant's liability shall be several and not joint, and the court shall enter a separate and several judgment in favor of the plaintiff and against each defendant for the apportioned amount of that defendant's liability.

(3) A defendant's liability in any of the following actions shall be joint and several, and the court shall enter a joint and several judgment in favor of the plaintiff and against the defendant for the total dollar amount awarded as damages:

    (i) Intentional misrepresentation.

    (ii) An intentional tort.

    (iii) Where the defendant has been held liable for not less than 60% of the total liability apportioned to all parties.

    (iv) A release or threatened release of a hazardous substance under section 702 of the act of October 18, 1988 (P.L. 756, No. 108), known as the Hazardous Sites Cleanup Act.

    (v) A civil action in which a defendant has violated section 497 of the act of April 12, 1951 (P.L. 90, No. 21), known as the Liquor Code.

42 Pa.C.S. § 7102 (a.1)(1-3).  The fair share statute was originally enacted in 2002 legislation, **see** June 19, P.L. 394, No. 57, § 2, but that legislation was found unconstitutional as violative of the single-subject rule.  **DeWeese v. Weaver**, 880 A.2d 54 (Pa. Commw. Ct. 2005), *aff'd per curiam sub nom*, **Deweese v. Cortes**, 906 A.2d 1193 (Pa. 2006).  The fair share rule was thereafter re-enacted in legislation effective June 28, 2011.  Thus, the fair share rule is inapplicable in this case, and we will apply the repealed § 7102(d) in determining whether a new compensatory damages trial has to include Highland.

When each tortfeasor was jointly and severally liable for the entire verdict and when a plaintiff had received a verdict against one tortfeasor but was incorrectly prohibited from recovery against a second one, the plaintiff was entitled to retain his verdict against the first tortfeasor and proceed to trial solely against the second one. This long-standing principle was elucidated in *Trerotola v. City of Philadelphia*, 29 A.2d 788 (Pa. 1943). Carmino Trerotola, individually and as guardian for Rocco Trerotola, sued the City of Philadelphia and the Philadelphia Gas Company jointly for injuries to Rocco and property damage that Carmino sustained due to a gas explosion. The parties agreed to pursue Rocco's case separately. A jury found in favor of Carmino and against the gas company but against Carmino and in favor of the city. The trial court awarded Carmino a new trial against the city, finding that the evidence established its negligence in maintaining water pipes caused water corrosion in the gas pipe that exploded. On appeal, the city contested the award of a new trial against it.

In ordering the grant of a new trial against the city, our High Court rejected the gas company's position that, since a new trial as to the city was awarded, that trial should also involve the gas company as a defendant. The *Trerotola* Court stated: "We think an obvious injustice would be done to this plaintiff if he should not be permitted to hold the verdict he won in a fair trial, against the Gas Company. Having secured a verdict against one of two alleged tortfeasors, the plaintiff should not be denied of his judgment

because the court believes that the verdict should have been rendered against both of the alleged tort-feasors." *Id*. at 790.

The ***Trerotola*** court relied upon a version of the joint tortfeasors liability act then in effect and that was identical to the one applicable herein, *i.e.*, it provided for joint and several liablity for the entire verdict from anyone found liable as a tortfeasor. Our Supreme Court ruled that Carmino was "entitled to hold and collect his judgment against the Philadelphia Gas Works Company, but he is entitled, of course, to only one recovery. If the Philadelphia Gas Works Company pays the judgment recovered by the plaintiff against it, it has the right to have the judgment so paid marked to its use so as to enforce contribution from the City of Philadelphia by establishing in an appropriate proceeding that the latter is, with the Gas Company, guilty of a joint wrong against the plaintiff." ***Id***.; ***Accord Rivera v. Philadelphia Theological Seminary of St. Charles Borromeo, Inc.*** 507 A.2d 1 (Pa. 1986).

In objecting to the grant of a new compensatory damages award solely against it, Grane relies upon ***Franklin Decorators, Inc. v. Kalson***, 479 A.2d 3 (Pa.Super. 1984), which is clearly distinguishable as it involved only one defendant. That decision provides that one plaintiff cannot obtain recovery on the same debt against the same defendant more than once.

Herein, there are two separate defendants. There is no need to re-litigate Highland's liability for compensatory damages in this lawsuit.[10]

## 2. PUNITIVE DAMAGES

### A. Grane

Mr. Scampone's next averment is that he is entitled to a new trial on punitive damages as to both Grane and Highland. In **Scampone I**, we extensively analyzed why the proof was sufficient to support an award of punitive damages as to both defendants. **Scampone I**, **supra** at 991 ("We conclude that Plaintiff's evidence established that both Highland and Grane acted with reckless disregard to the rights of others and created an unreasonable risk of physical harm to the residents of the nursing home."). That ruling was left undisturbed by our Supreme Court in **Scampone II**. **Scampone II**, **supra** at 595 n.11.

### B. Highland

Highland insists that it should not be involved in a new punitive damages trial, maintaining that the issue of punitive damages as to it has been fully and fairly litigated. We disagree. Mr. Scampone's request for a new trial as to Highland is premised upon the fact that there was confusing evidence submitted that both Grane and Highland employees were

---

[10] At this juncture, the issue not being before us, we offer no opinion as to the effect of a possible compensatory damages award against Grane as it pertains to the existing compensatory damages award against Highland.

responsible for the activities at the nursing home that warranted an award of punitive damages, yet he was not permitted to proceed against Grane. Mr. Scampone further avers that reversible error occurred when he was not permitted to introduce certain evidence at the punitive damages trial.

We agree that the new punitive damages trial must include Highland. First, Mr. Scampone was improperly prohibited from introducing evidence relevant to the question of whether punitive damages were warranted against Highland. A trial court's ruling as to an evidentiary matter is within its discretion, and "should not be disturbed on appeal unless the trial court abuses its discretion." *Grady v. Frito-Lay, Inc.*, 839 A.2d 1038, 1046 (Pa. 2003). Herein, the trial court prohibited Mr. Scampone from introducing into evidence certain Pennsylvania Department of Health ("DOH") surveys. The trial court admitted into evidence DOH surveys related to the failure to hydrate patients properly, which was the condition that led to Madeline's death, but refused to admit DOH surveys that pertained to other substandard patient-care issues found by the DOH at the nursing home.

Mr. Scampone argues that all DOH deficiencies outlined in surveys from August 22, 2002, through July 16, 2004, regarding patient care at the nursing home, were admissible to demonstrate that the defendants were aware of various dangerous conditions that existed at the nursing home and that they recklessly disregarded their responsibility to correct them. The excluded surveys establish that, in the years preceding Madeline's death,

Highland/Grane violated DOH regulations by, *inter alia*, neglecting to: 1) develop comprehensive resident care plans for each resident; 2) comply with numerous physician orders regarding patient care for residents, including orders for laboratory tests; 3) promptly notify the DOH of a serious incident; 4) notify physicians of significant changes in residents' conditions; 5) meet a number of residents' physical and nutritional needs, and 6) establish an infection control program.

We concur that the surveys were relevant to the issue of punitive damages. ***Mitchell v. Shikora***, 2017 PA Super 134 (filed May 5, 2017) ("Evidence is relevant if it has 'any tendency to make a fact of consequence more or less probable than it would be without the evidence.' Pa.R.E. 401. . . . . [R]elevant evidence 'is admissible except as otherwise provided by law.' Pa.R.E. 402."). The surveys demonstrated the existence of across-the-board substandard care rendered at the nursing home and were relevant to show that Highland and Grane had knowledge of these deficiencies in patient care and blithely ignored them by failing to increase staffing levels. The surveys, Mr. Scampone continues, notified Highland/Grane that there were numerous issues regarding the quality of patient care at the facility and proved that, despite this knowledge, Highland/Grane knowingly failed to take corrective measures to remedy the neglect of patients at the facility. In other words, the deficiencies involved with Madeline's care were not isolated incidents,

and the DOH surveys demonstrated that the nursing home was operated in a systemic manner such that patient neglect was common.

The surveys in question demonstrated various issues of consequence regarding patient care at the nursing home. The failure to respond appropriately to these findings tended to establish that the defendants acted with reckless disregard as to the safety of their patients. As well noted in **Hall v. Episcopal Long Term Care**, 54 A.3d 381, 395 (Pa.Super. 2012), punitive damages can be awarded if a plaintiff establishes that the defendant "acted in an outrageous fashion due to either the defendant's evil motive or his reckless indifference to the rights of others;" proof must be adduced that "goes beyond a showing of negligence, evidence sufficient to establish that the defendant's acts amounted to intentional, willful, wanton or reckless conduct."

In this case, there was proof of systemic understaffing, the defendants' knowledge of the same and inaction in the face of it, and the defendants' employees altered patient records to reflect that care was given when it was not. The DOH surveys had a tendency to confirm that these types of abuses occurred. They were therefore relevant herein, and the trial court abused its discretion in excluding them from evidence.

We also conclude that the punitive damages trial must include Highland since, according to Mr. Scampone's evidence, its employees colluded with Grane employees in some of the actions that warranted

imposition of punitive damages, *i.e.*, the alteration of patient records. There is no need to have the jury, once again, face a situation where it cannot impose liability on an entity involved in the activities at issue.

### 3. DISCOVERY VIOLATIONS

Mr. Scampone's third contention concerns the denial of his motion for sanctions due to discovery violations. As we noted in ***Anthony Biddle Contractors, Inc. v. Preet Allied Am. St., LP,*** 28 A.3d 916, 922 (Pa.Super. 2011) (citation omitted), "generally, on review of an order concerning discovery, an appellate court applies an abuse of discretion standard." Mr. Scampone filed a motion asking that Highland's answer be stricken, and that it be prevented from asserting any defenses due to its discovery violations. **See** Plaintiff's Motion To Strike Highland Defendant's Answer And Affirmative Defenses, 9/18/14.

We first examine Mr. Scampone's specific averments regarding the discovery violations at issue. First, he points to the defendants' failure to produce a policies and procedures manual that Grane created for the nursing home that Mr. Scampone requested during discovery. The Plaintiff uncovered the manual after it was disseminated in another lawsuit. Second, Mr. Scampone contends that, despite the fact that Highland failed to update its answers to Mr. Scampone's discovery requests as ordered, Highland was permitted to introduce, at the second trial, undisclosed materials, including

400 pages of staffing sheets as well as payroll documents. Finally, the defendants understated the amount of their insurance coverage. These three discovery failures are the basis for the Plaintiff's sanctions request.

The specific sanction that the Plaintiff sought was that "Highland's answer and affirmative defenses should be stricken." **See** Appellant's brief at 56 (footnote omitted). If the answer were stricken, then the Plaintiff would be entitled to entry of a default judgment as to liability. A similar result would follow if the defendants were precluded from mounting any defense. Thus, Mr. Scampone essentially requested a directed verdict in his favor as to liability. This type of sanction is, in terms of its effect on a defendant in a lawsuit, the equivalent of dismissing a plaintiff's case.

As we observed in **Estate of Ghaner v. Bindi**, 779 A.2d 585, 589 (Pa.Super. 2001) (citation omitted), the sanction of dismissal is the "the most severe sanction, [which] should be imposed only in extreme circumstances[.]" Accordingly, the "trial court is required to balance the equities carefully and dismiss only where the violation is willful and the opposing party has been prejudiced." **Id**. The following factors are applied to determine whether dismissal is appropriate as a discovery sanction:

(1) the nature and severity of the discovery violation;

(2) the defaulting party's willfulness or bad faith;

(3) prejudice to the opposing party;

(4) the ability to cure the prejudice; and

(5) the importance of the precluded evidence in light of the failure to comply.

*Id*. (citation omitted).

We conclude that the trial court did not abuse its discretion in refusing to direct a verdict on liability in favor of Mr. Scampone due to the discovery violations at issue herein. Regardless, the Plaintiff is now in possession of the manual and knows the level of insurance coverage, and any prejudice from the late disclosure of the staffing sheets and payroll records has been dispelled by our grant of a new trial as to punitive damages. Accordingly, we affirm the trial court's denial of Mr. Scampone's motion for sanctions.

However, this Court does express its profound disapproval of the flaunting of the applicable discovery rules by Grane and Highland. Their failure to produce the manual and update discovery responses were improper and inexcusable, and if the fault of counsel, may well constitute a violation of the Rules of Professional Conduct.[11] Especially egregious was Highland's "sudden" discovery of staffing sheets during trial and payroll records critical to the understaffing issue, which was an aspect of Mr. Scampone's punitive damages claim. Appellees also misrepresented their insurance coverage. Despite these improper actions, we cannot find an

---

[11] Rule of Professional Conduct 3.4 provides that a lawyer shall not "unlawfully obstruct another party's access to evidence[.]" Pa.R.Prof.C. 3.4(a).

abuse of discretion in the trial court's refusal to impose the extreme sanction of precluding Appellees from presenting a defense.

Nevertheless, some type of sanction, including a monetary fine to prevent further abuses by Appellees, would be appropriate. We observe that, in his motion, in addition to requesting that Highland be prevented from mounting a defense at the upcoming punitive damages trial, the Plaintiff did request, "such other and further relief as this Court may deem just and proper under the circumstances." Plaintiff's Motion To Strike Highland Defendant's Answer And Affirmative Defenses, 9/18/14, at 9. Appellees' contumacious behavior warranted some sort of punishment as it represented an open flaunting of the applicable discovery rules. Hence, upon remand, the trial court is to consider another type of sanction that would be appropriate herein.

## 4. RECUSAL

Mr. Scampone's fourth averment is that the trial court improperly denied his motion for recusal. As our Supreme Court articulated in *In re Lokuta*, 11 A.3d 427, 435 (Pa. 2011), "An appellate court presumes judges are fair and competent, and reviews the denial of a recusal motion for an abuse of discretion." The Plaintiff maintains that the court made statements "regarding its inability to understand concepts that are at the crux of this case," and that the remarks rendered the trial court unable to "discharge its

duty in adjudicating the post-trial motions," creating the "appearance of impropriety." Appellant's brief at 30, 60, 61.

Our Supreme Court has articulated that the "appearance of impropriety is sufficient justification for the grant of new proceedings before another judge. A jurist's impartiality is called into question whenever there are factors or circumstances that may reasonably question the jurist's impartiality in the matter." *Lokuta*, *supra* at 435. Herein, however, Mr. Scampone's complaints about the trial court do not actually impugn its neutrality, and he does not cite any judicial comments that displayed prejudice in terms of the parties to this action.

Rather, the grounds for recusal leveled in the appellate brief are that the trial court indicated that it did not understand the distinction between the concepts of direct corporate liability and vicarious liability. Appellant's brief at 30-32; Appellant's brief at 59, n.31 (relying upon facts outlined at page 30-32 in support of position that the Plaintiff is entitled to recusal). If the trial court's comments were accepted at face value, they could implicate its competency to preside over this matter. However, the trial court explained that its remarks were off-the-cuff and not to be taken seriously. Most importantly, and contrary to the Plaintiff's position, the statements did not create the appearance of impropriety because they did not display bias. *Cf. Judicial Inquiry & Review Bd. of Supreme Court of Pennsylvania v. Fink*, 532 A.2d 358, 367 (Pa. 1987) (emphases added) ("Tongue-in-

cheek remarks **which announce that the judge will favor one party over another** are grossly improper, and if such remarks are made, the judge who makes them must stand down from **any controversy in which he has indicated a bias**.").  While the comments in jest about a jurist's ability to decide a matter are probably not prudent, we find that the trial court's remarks about the issues in this matter, standing alone, cannot be construed as undermining its ability to decide this case.  Thus, we do not find an abuse of discretion in the trial court's recusal ruling.

## 5. ORDER OF AUGUST 31, 2015

The final issue presented in this appeal concerns the August 31, 2015 order.  The procedural history culminating in that order follows.  Mr. Scampone entered judgment against Highland for $193,500 in compensatory damages awarded by the jury in 2007.  After remand by our Supreme Court, he attempted to execute on the judgment.  Highland sought to avoid execution on its property and made a tender on April 2, 2015:

> the following offer on behalf of his clients: Highland Park . . . **and** Grane Healthcare Company tender the enclosed judgment draft in the amount of $294,948.46. . . . This tender draft represents **complete satisfaction** and **payment in full** of any and all post judgment interest, *etc.* as of this date, April 2, 2015.

Defendants' Motion for Leave to Pay Money into Court, 4/19/15, at Exhibit A (emphases added).

Mr. Scampone's counsel concluded that the emphasized language was intended to trick Mr. Scampone into waiving any and all rights on appeal, and he refused to satisfy the judgment based upon the terms and conditions set forth in the April 2, 2015 communication. Thereafter, Highland and Grane filed a Motion for Leave to Pay Money into Court. They averred that "the **only** reason the judgment has not been satisfied is [Mr. Scampone's] counsel's bad faith refusal to accept tendered funds." **Id**. at ¶ 10 (emphasis in original). After objections were filed to that averment, Highland and Grane presented an amended motion that leveled the identical assertion. Defendants' Amended Motion for Leave to Pay Money into Court, 4/15/05, at ¶ 11.

On April 24, 2015, the defendants increased their offer, but still indicated that the tender represented a complete satisfaction and payment in full and was made on behalf of both Highland and Grane. Mr. Scampone again refused the tender, believing that its acceptance would result in waiver of his ability to pursue a trial as to Grane and a new trial on punitive damages.

Mr. Scampone, in rejecting the tender and opposing the Motion for Leave to Pay Money Into Court, adopted the position that, if he accepted the tender, Highland and Grane would have been able to maintain that Mr. Scampone waived his right to recover (1) compensatory and punitive

damages against Grane; (2) punitive damages against Highland; and (3) costs.

The trial court recognized that Highland and Grane could take the position that, if Mr. Scampone accepted the check, he waived the ability to pursue a new trial as to Grane's liability and another punitive damages trial, which would include Grane and Highland. Nevertheless, it declined to decide that issue and entered the order now challenged by Mr. Scampone on appeal:

> AND NOW, this 31st day of August, 2015, it is hereby Ordered, Adjudged and Decreed as follows:
>
> 1. The defendants' Amended Motion for Leave to Pay Money into Court is hereby Granted. Defendants may pay into Court an appropriately calculated judgment amount (approximately $295,000.00).
>
> 2. [Mr. Scampone] is hereby prohibited from executing on the judgment entered in this case absent a further order from this Court permitting execution. In the event defendant[s] elect to not pay money into court pursuant to this order, or if [Mr. Scampone] believes that defendants' payment of money into Court is an insufficient amount, so as to warrant the Court's reconsideration of permitting [Mr. Scampone] to execute, an appropriate motion may be presented to the Court.
>
> 3. All remaining motions currently pending before the Court, including motions for sanctions and cross motions for sanctions are, hereby, denied.

Trial Court Order, 8/31/15, at 1.

Mr. Scampone contends that this order violated his due process by preventing him from executing on a substantive property right, which was his monetary judgment. In making this argument, he relies solely upon language from *Commissioners of Sinking Fund of City of Philadelphia v. City of Philadelphia*, 188 A. 314, 317 (Pa. 1936), that "no order can be made by a court in the enforcement of a judgment which would, in violation of 'due process,' take from a litigant substantive property rights."

Although he does not refer us to the pertinent authority, Mr. Scampone is correct in asserting that the court cannot enjoin the execution of a monetary judgment without due process; however, judgment must first be entered as to those damages, and it must be entered as to each party to which execution would attach. *See Breidenthal v. McKenna*, 14 Pa. 160 (Pa. 1850) (finding that an execution against joint defendants will be set aside when the judgment was obtained against only one); *Irons v. McQuewan*, 27 Pa. 196 (Pa. 1856) ("A plaintiff having a judgment ripe for it, has a vested right to execution process, with all the legal incidents of such process[.]"); *Haggerty v. Moyerman*, 184 A. 654, 655, 656 (Pa. 1936) (stating "While it is true a judgment creditor has an unquestioned right to issue execution, levy upon, and sell real estate belonging to his debtor in the manner prescribed by law, it is equally true that this right may be so unconscionably exercised as to amount to an abuse of legal process."); *In re Upset Sale, Tax Claim Bureau of Berks County*, 479

A.2d 940 (Pa. 1984) (holding that a judgment creditor's interest cannot be deprived without due process of law).

Moreover, under the plain language of Pa.R.C.P. 3103(a), execution may be commenced upon the filing of a praecipe immediately upon the entry of judgment, regardless of the pendency of post-trial motions or even an appeal, except in limited circumstances not applicable here. Pa.R.A.P. 3103(a) ("Execution shall be commenced by filing a praecipe for a writ of execution with the Prothonotary of any county in which judgment has been entered."); Goodrich-Amram § 3103(a):2 (2d ed.).

Nonetheless, the rules regarding the writ of execution provide the process necessary to ensure that neither party's interest is violated following the filing of the writ. Although the judgment creditor retains authority to withdraw or suspend a writ of execution at any time, the ultimate control of the execution process rests with the trial court. *Unity Sav. Ass'n v. American Urban Sciences Foundation, Inc.*, 487 A.2d 356, 359 (Pa.Super. 1984). Since execution lies within the court's equitable powers, it is the court's responsibility to see that the execution process is not abused. *Id*.; *Capozzi v. Antonoplos*, 201 A.2d 420, 422 (Pa. 1964). Thus, the court's decision to deny or grant an execution will not be overruled absent an abuse of discretion. *Boyertown Oil Co., Inc. v. Osan Mf. Co., Inc.*, 514 A.2d 938, 940 (Pa.Super. 1986). In this context, the court has a duty "to protect against unjust attempts at execution," but "must be careful

to prevent overly technical interferences with the execution process and a resultant elevation of form over substance." ***Patterson v. Hopkins***, 371 A.2d 1378, 1383 (Pa.Super. 1977).

Here, Mr. Scampone did not argue that the court abused its discretion in temporarily staying his writ of execution. Rather, he asserts that the court denied him due process by enjoining his execution because he has a vested property right in that judgment. Mr. Scampone does not expand upon this position or explain how the rules regarding execution violate his right to due process. Instead, he complains that Highland could have averted this issue by tendering to him an unconditional offer.

Assuming Mr. Scampone has a vested property interest in his judgment, he has not argued that the trial court abused its discretion in staying his writ of execution. Moreover, even if he asserted that argument, we cannot find that the trial court abused its discretion when entering the order because this matter remained ongoing both as to Highland and Grane when the order was entered.

Indeed, in the event that Mr. Scampone loses against Grane as to liability and against both Grane and Highland as to punitive damages, the trial court order actually protects Mr. Scampone. The order escrows nearly $300,000 that Mr. Scampone may be secure in his belief that he will receive. Thus, due to the lack of finality of this action, the fact that money has been paid into court, and the trial court's discretionary powers of the execution

process, we find Mr. Scampone's due process rights were not violated by the order in question.

In the appeal at 716 WDA 2015, the April 27, 2015 judgment is reversed, and the case is remanded for proceedings consistent with this adjudication. The appeal at 717 WDA 2015 is dismissed. At 1354 WDA 2015, the August 31, 2015 order is affirmed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/8/2017