J-A06009-18

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| JAMES TEMPLE, AS ATTORNEY-IN-FACT FOR ELMA BETTY TEMPLE, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| PROVIDENCE CARE CENTER, LLC D/B/A PROVIDENCE CARE CENTER, | |
| Appellee | No. 87 WDA 2017 |

Appeal from the Order Entered December 14, 2016
In the Court of Common Pleas of Beaver County
Civil Division at No(s): 11726-2012

BEFORE:  BENDER, P.J.E., SHOGAN, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED  JULY 10, 2018**

Appellant, James Temple, as attorney-in-fact for Elma Betty Temple, appeals from the trial court's order granting Appellee, Providence Care Center, LLC d/b/a Providence Care Center (referred to herein as Providence), a new trial as to both liability and compensatory damages.  In addition, Appellant challenges the trial court's entry of judgment notwithstanding the verdict (JNOV) in favor of Providence on punitive damages, and the nonsuit granted in favor of Grane Healthcare Company (referred to herein as Grane) at trial. After careful review, we affirm in part, reverse in part, and remand for further proceedings.

_____

[*] Retired Senior Judge assigned to the Superior Court.

Ms. Temple — who has Alzheimer's disease — became a resident of Providence, a skilled nursing facility in Beaver Falls, Pennsylvania, in 2008. Providence owned and operated the facility, and Grane provided management services to Providence. On November 28, 2011, Ms. Temple — who was 81 years old at the time — fell while walking toward a ramp at the facility during lunch, which caused her to suffer a right humerus fracture, a right pelvic fracture, and a right elbow laceration. According to Appellant, the only witness to this fall was the hospice chaplain, who was not a caretaker at Providence and confirmed that she was unsupervised at the time. *See* Appellant's Brief at 16.

On September 26, 2012, Appellant — Ms. Temple's son — filed a complaint on her behalf against Providence and Grane, asserting claims of negligence and corporate negligence. He also demanded punitive damages. In the complaint, he alleged, among other things, that Providence and Grane knew or should have known that Ms. Temple required the supervision of nursing staff to ambulate, transfer, and perform activities of daily living, especially given that Ms. Temple had suffered other, less serious falls as recently as October 25, 2011, and November 23, 2011. *See* Complaint, 9/26/2012, at ¶¶ 12, 18-20; *see also* Appellant's Brief at 14-17. Further, he claimed that Providence and Grane grossly understaffed the facility, to the point where staff members could not meet the needs of the residents, and failed to provide safety measures to prevent Ms. Temple from falling. *See* Complaint at ¶ 40.

This case proceeded to an eight-day jury trial in May of 2016.[1] At the close of Appellant's case, Grane moved for a nonsuit, arguing that it did not owe, nor breach, a duty to Ms. Temple. **See** N.T. Trial, 5/19/2016, at 166-210. The trial court granted the nonsuit and dismissed Grane from the case. In addition, Providence challenged, via motions for nonsuit and directed verdict, whether Appellant had adduced sufficient evidence to support a claim for punitive damages. **See id.** at 211-214; N.T. Trial, 5/23/2016, at 76-79. The trial court denied both motions, determining that the evidence could support a finding that Providence engaged in reckless conduct.

Thereafter, the jury returned a verdict in favor of Appellant in the amount of $2,000,000 for compensatory damages and $250,000 for punitive damages. Both Providence and Appellant subsequently filed post-trial motions. Ultimately, the trial court (1) granted Providence's motion for JNOV with respect to punitive damages, determining that Providence's conduct amounted to nothing more than negligence, **see** Opinion and Order on Providence's Post-Trial Motions, 12/14/2016, at 4; (2) granted Providence a new trial as to liability and compensatory damages for multiple reasons, including because the verdict was against the weight of the evidence, **see id.** at 8-37; and (3) concluded that it had properly granted a nonsuit as to Grane, explaining that Grane owed no duty to Ms. Temple and, even if it had,

---

[1] The record contains thousands of pages of trial transcripts. In the interest of brevity, and because the parties are aware of the facts of this case, we do not delve deeply into the details of the trial here, but defer any necessary discussion thereof to our analysis of Appellant's issues *infra*.

Appellant offered no expert testimony to demonstrate that Grane's actions fell below the accepted standard of care and caused Ms. Temple's injuries. *See* Opinion and Order on Appellant's Post-Trial Motion, 12/20/2016, at 13-14.

Appellant filed a timely notice of appeal, and timely complied with the trial court's instruction to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Appellant presently raises the following issues for our review:

1. Did the trial court err when it ordered a new trial for both liability and compensatory damages against [Providence]?

2. Did the trial court err when it entered a JNOV as to the punitive damages verdict award[ed] against Providence?

3. Did the trial court err when it dismissed … Grane … from this case?

Appellant's Brief at 5.[2]

First, Appellant argues that "the trial court committed reversible error when it vacated the compensatory damages verdict and granted Providence a new trial." *Id.* at 33 (capitalization and unnecessary emphasis omitted). For such claims, we apply the following standard of review:

In reviewing a trial court's decision to grant or deny a motion for a new trial, it is well-established law that, absent a clear abuse of discretion by the trial court, appellate courts must not interfere with the trial court's authority to grant or deny a new trial.

---

[2] An appeal may be taken as of right from "[a]n order in a civil action or proceeding awarding a new trial." *See* Pa.R.A.P. 311(a)(6). Appellant's issues pertaining to punitive damages and Grane's dismissal go to the scope of the new trial and, in the interest of judicial economy, we will address them herein. In other words, we will treat the decisions by the court as being one order for our purposes herein. We also note that the parties do not dispute our ability to review all of the issues raised by Appellant on appeal.

- 4 -

Moreover, a new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake.

… [W]e must first determine whether we agree with the trial court that a factual, legal or discretionary mistake was, or was not, made. If we agree with the trial court's determination that there were no prejudicial mistakes at trial, then the decision to deny a new trial must stand. If we discern that a mistake was made at trial, however, we must then determine whether the trial court abused its discretion in ruling on the motion for a new trial. A trial court abuses its discretion by rendering a judgment that is manifestly unreasonable, arbitrary or capricious, or has failed to apply the law, or was motivated by partiality, prejudice, bias or ill will.

***Atwell v. Beckwith Machinery Co.***, 872 A.2d 1216, 1221 (Pa. Super. 2005)

(citation omitted).

Here, the trial court gave the following explanation as to why it decided

to grant Providence a new trial on liability and compensatory damages:

> ***[T]he [c]ourt notes that the main reason for ordering a new trial was not the substantial verdict, but the fact that the [c]ourt did not believe the trial was fair.***
>
> Although we stated in our opinion that the verdict shocked the conscience of the [c]ourt, if this were a case of purely compensatory damages, we likely would <u>not</u> have awarded a new trial. ***The main problem in this case was [Appellant's] counsel's failure to follow the rules, and his co-mingling of arguments regarding compensatory and punitive damages, despite the court's admonition against this.***
>
> As discussed through the [c]ourt's opinion on [Providence's] post-trial motions, [Appellant's] counsel repeatedly violated this [c]ourt's pre-trial orders and rulings during the trial, as well as its instructions prior to closing argument. For example, counsel sought to introduce the star[]rating of the nursing home, after

being told such evidence was inadmissible.[3]  If this were the only issue, we likely would not have granted a new trial.  But the improper conduct continued.

After being specifically warned against any type of punishment argument being used in the closing argument of [the] compensatory phase of the case, [Appellant's] counsel, twice, argued about [Providence's] excessive wealth, and used language suggesting the jury should send a message to [Providence], which, we believe, the jury clearly did in its award.[4]  Although

---

[3] According to Appellant, the star rating "was created to help the public research and compare the quality of care at nursing homes.  There is an overall rating of 1 to 5 stars for each nursing home, which is comprised of the following components: health inspections, quality measures, and staffing."  Appellant's Brief at 34 (footnote and citation omitted).  The trial court sustained Providence's objection to testimony regarding its star rating because "no one from the independent entity … that generates the star rating … was going to testify about how the rating was arrived at, or what it meant[,]" and "the prejudicial effect of this testimony far outweighed any probative value, given that there would be no testimony about how it was calculated for the jury."  *See* Opinion and Order on Providence's Post-Trial Motions at 25 (citation omitted).

[4] In its earlier opinion granting, in part, Providence's post-trial motions, the trial court had opined:

> [Ms.] Temple was 81 years old at the time of her fall.  When she fell, she sustained two non-displaced fractures, one in her right humerus and one in her pelvis.  Neither required surgery.  She was treated with a sling and a three-day hospital admission, after which time she returned to Providence.  These injuries were temporary; she completely healed from these injuries in 8 months or less, and has no limitations as a result of these fractures.  She had severe dementia and numerous co-morbidities prior to her fall.  There was no claim for economic losses.  The extent of her harm does not warrant a $2,000,000 award for pain and suffering.
>
> …
>
> Based on the facts of the case at bar, involving an elderly woman who has recovered from her injuries, and has made no claim for lost wages, out of pocket medical expenses or other economic

we had no authority to question the jury about [its] decision, unless everyone agreed, this [c]ourt tried to salvage the verdict by suggesting that we ask the jury whether they included damages for punishment in their initial verdict. The parties would not agree to this.

Granting a new trial is not something this [c]ourt takes lightly. The parties and the [c]ourt spent eight days and considerable expense in this trial. However, when a trial judge believes that the trial was not fair, that judge is obliged to correct it. The role of the trial judge is to make evidentiary rulings, give proper instructions, and ensure that both sides have a level playing field, so that the jury is able to reach a proper verdict. Here, we simply believe the trial was not fair.

Rule 1925(a) Opinion, 3/8/2017, at 2-4 (some emphasis in original; footnote omitted).

As highlighted above, the trial court stated that the main problem in this case was Appellant's "failure to follow the rules, and his co-mingling of arguments regarding compensatory and punitive damages, despite the court's admonition against this." Rule 1925(a) Opinion at 2. In support, the court points to the star rating testimony to exemplify Appellant's disregard of its rulings, and to Appellant's closing arguments, where he purportedly encouraged the jury to punish Providence. *Id.* at 2-3. Because the trial court focuses on these incidents to demonstrate why it believed that the trial was unfair, we examine each in turn to ascertain if they warrant a new trial.

---

claims, a $2,000,000 compensatory award, is entirely against the weight of the evidence presented at trial, and is so contrary to the evidence as to shock one's sense of justice, such that a new trial, at least on the issue of damages, should be granted.

Opinion and Order on Providence's Post-Trial Motions at 9-10.

- 7 -

With respect to the star rating testimony, Appellant states that his line of questioning regarding it was not a flagrant violation of the trial court's ruling prohibiting such testimony. Appellant's Brief at 37. Instead, he says the questioning was an attempt to clear up confusion after Grane's Vice President of Nursing Services — Beth Lengle — "brought up the star[]rating herself, unprompted by [Appellant]." *See id.* at 35. Further, he claims that Providence did not immediately object to such testimony, and when it finally did object, it did not ask for a mistrial. *Id.* at 38.

We have reviewed the transcript and agree with the trial court that Appellant improperly asked the witness about Providence's star rating. Appellant does not dispute that the trial court had prohibited him from discussing Providence's star rating. *See id.* at 35.[5] Nevertheless, the following exchange occurred at trial:

> [Appellant's counsel:] So the, during this window [when state evaluators must complete a survey of the facility,] you can, you track and you have to complete 671 Forms; right?
>
> [Beth Lengle:] Correct.
>
> [Appellant's counsel:] And that's the documents that include the resident characteristics in the facility?
>
> [Beth Lengle:] 671 is a form from [Centers for Medicare & Medicaid Services (CMS)], and on it includes staffing numbers of everyone.

---

[5] *See also* Opinion and Order on Providence's Post-Trial Motions at 25-26 ("When [Appellant] tried to argue for the admission of this [star rating] evidence the first time, we said no, it was not coming in. In fact, we repeatedly said 'No' or 'Nope' 12 times with respect to this issue.").

[Appellant's counsel:] And the, the documents that you provide the state, they'll evaluate what the facility is like staff-wise based on those documents?

[Beth Lengle:] Those and payroll records, yes.

[Appellant's counsel:] They can look further if they see something that they think is suspicious, but they're going to look at those documents; right?

[Beth Lengle:] No, they look at 671, but they also look for, they'll pick random weeks, and they'll ask for the actual staffing sheets, and a lot of times they'll ask for the actual payroll records of those weeks. This is, the 671 is actually a standard form that's used by every nursing home, and they use it for the star rating, so it's actually, they're kind of two different things.

[Appellant's counsel:] Do you have a good understanding of the star rating?

[Beth Lengle:] I have a fairly, it, it's very complicated.

[Appellant's counsel:] But you understand what the star rating is?

[Beth Lengle:] Yes.

[Appellant's counsel:] Now, this document, you're telling all of the facilities that are with, with contracts with Grane … how to provide 671 Forms to the state?

[Beth Lengle:] I'm giving them tips, yes, tips, reminders.

[Appellant's counsel:] And what you're telling them is in order to capture the most nursing hours, they're to select the 671 Forms that have the most nursing hours in the period?

[Beth Lengle:] Following the time frame requirements that are given by, by the Department of Health.

[Appellant's counsel:] So you pick the best ones?

[Beth Lengle:] In that time frame, yes.

[Appellant's counsel:] The ones that reflect the most staffing?

[Beth Lengle:] Yes.

[Appellant's counsel:] And you tell all of the facilities to include in those numbers orientation hours; right?

[Beth Lengle:] Correct. On the, the 671 allows for that.

[Appellant's counsel:] This is what's going to reflect the direct staffing numbers of the facility, though; right?

[Beth Lengle:] No, not necessarily.

[Appellant's counsel:] So you think you're allowed to give them numbers that aren't actually staff members providing direct care?

[Beth Lengle:] That's --

> [Providence/Grane's counsel]: Your Honor, I think we've got a disconnect on two different things, the Department of Health numbers --

> [Appellant's counsel]: Your Honor, if he has a speaking objection, then --

> [Providence/Grane's counsel]: No, you're, you're mixing the two, and I think she's articulating that, and you're trying to confuse the two.

> [Appellant's counsel]: Well, he can, he has his opportunity to ask his own questions, Your Honor.

> [The court]: All right. I, I'm going to sustain the objection as to the form of the question, and I will allow you to re-ask the question or, or maybe we just need some more foundation on what this 671 is.

> [Providence/Grane's counsel]: That's, I think that's my objection, Your Honor.

[Appellant's counsel:] Do you have an understanding that based on the six, the five-star reports that there will be a rating for staffing from one star, two star, three star, four star, five star; right?

[Beth Lengle:] Yes, but that is not the same thing as the daily staffing numbers.

[Appellant's counsel:] The, do you recall what the staffing, the star[]rating was for Providence … back in --

> [Providence/Grane's counsel]: Objection, Your Honor. We've talked about this.

> [The court]: Sustained.

[Beth Lengle]: Do I answer?

[The court]: No.

[Beth Lengle]: I'm sorry. Okay. Sorry.

N.T. Trial, 5/18/2016, at 197-200.[6]

As Providence aptly explains:

First, [Appellant's] argument that Ms. Lengle "brought up the star[]rating herself" is, at best, misleading. While Ms. Lengle used the words "star rating" in discussing the purpose of the Facility's 671 form in response to counsel's questions about its purpose, she did not attempt to explain or identify what the star rating was, either in substance or value. Indeed, she does not even reference that the rating relates to staffing. Nevertheless, after asking multiple other questions about the 671 form (and two pages later in the trial transcript) counsel, unprompted by the witness, asks, "Do you have an understanding that based on the six, the five-star reports there will be a rating for staffing from one star, two star, three star, four star, five star; right?" Unlike Ms. Lengle's innocent reference to [the] star rating as one of the uses of the 671 form information, counsel's question went straight to the heart of the very thing that the [c]ourt had already prohibited as prejudicial — the existence of [a] one to five star rating system. If that was not bad enough, he then asked what Providence's star rating was, a question that a reasonable juror would expect to be asked by counsel who anticipated a low star rating in response. This firmly planted the seed of bias in the mind of the jurors.

Providence's Brief at 29-30 (internal citations omitted). We concur.

Additionally, we disagree with Appellant that Providence waived this claim by not objecting immediately and asking for a mistrial. "[A] trial judge has the power to grant a new trial *sua sponte* if he [or she] determines that

---

[6] We provide a long excerpt here because Appellant disputes the trial court's characterization of the exchange. **See** Appellant's Brief at 37 ("Although the court insists that the witness did not volunteer information regarding the star[]rating, the record establishes otherwise.") (citations omitted).

the interests of justice so require." ***Armbruster v. Horowitz***, 813 A.2d 698,

704 n.6 (Pa. 2002) (citations omitted). Thus, Providence's late objection and

failure to request a mistrial cannot waive the trial court's power to *sua sponte*

order a new trial.[7]

_____

[7] We reject Appellant's arguments that (1) the trial court did not actually grant Providence a new trial *sua sponte*, but instead granted a new trial in response to Providence's post-trial motions asking for a new trial, ***see*** Appellant's Reply Brief at 35; (2) the trial court did not have unlimited power to grant a new trial because this is a civil case, ***see id.*** at 36; and (3) courts are allowed wide discretion in deciding whether to award a new trial but only where the party raises timely, specific objections during trial, asking for that relief, ***see id.*** at 37-38. First, notwithstanding Providence's post-trial motions asking for a new trial, it is evident that the trial court felt compelled to grant a new trial independent of Providence's motions requesting such relief. ***See*** Rule 1925(a) Opinion at 3 ("[W]hen a trial judge believes that the trial was not fair, that judge is **obliged** to correct it.") (emphasis added). Second, we disagree that ***Commonwealth v. Powell***, 590 A.2d 1240 (Pa. 1991), represents that "the trial court's authority to grant a new trial *sua sponte* 'in the interest of justice' was born out of the Federal Rules of Criminal Procedure[,]" and therefore cannot be "neatly transferred" to civil cases. Appellant's Reply Brief at 36 (citing ***Powell***, 590 A.2d at 1242). In ***Powell***, our Supreme Court recognized that "[t]he rationale 'in the interest of justice' is deeply rooted in both federal jurisprudence ***and the common law of Pennsylvania***." ***Powell***, 590 A.2d at 1242 (emphasis added). Indeed, in support of this assertion, it cites various civil cases from Pennsylvania courts upholding this principle. ***Id.*** at 1242-43. Thus, we are unconvinced that ***Powell*** is limited to criminal cases. Finally, we disagree with Appellant that a party must make timely and specific requests for a new trial before a trial court can *sua sponte* grant a new trial. *Sua sponte*, by definition, means "[w]ithout promoting or suggestion; on its own motion." *Black's Law Dictionary* 1650 (10th ed. 2014). Furthermore, Appellant's reliance on ***Tangnani v. Lew***, 426 A.2d 595 (Pa. 1981), is distinguishable in that the error in that case did "not rise to the level of offending 'justice and fairness.'" ***Id.*** at 596 n.2. It also involved only one error, and not the multiple errors the trial court points to in the case *sub judice*. In any event though, ***Powell*** and ***Armbruster*** post-date ***Tangnani***, and signify that trial courts may grant new trials *sua sponte.* ***Armbruster, supra***; ***Powell***, 590 A.2d at 1243 ("Where it will result in the attainment of justice, a trial court may grant a new trial **without the initiation of the defendant**.") (citations omitted; emphasis added).

Next, Appellant defends his closing argument in which the trial court found that he 'co-mingled' arguments pertaining to compensatory and punitive damages. He argues that Providence waived all issues relating to his closing argument by agreeing that a cautionary instruction was appropriate. **See** Appellant's Brief at 42-43. Moreover, Appellant insists that — even if not waived by Providence — his closing remarks were not improper. **Id.** at 45.

Although Providence did not request a mistrial immediately following Appellant's closing argument, we again find that this omission does not preclude the trial court from granting a new trial *sua sponte*. **See Armbruster, supra.** Furthermore, we disagree with Appellant's argument that the trial court "pull[ed] bits and pieces of [his] closing argument, without providing proper context" to support its conclusion that Appellant's closing remarks were inappropriate. Appellant's Brief at 45. The trial court specifically told Appellant that "there was to be no mention of the wealth of [Providence] in the closing argument, nor was there to be any mention of punishment." Opinion and Order on Providence's Post-Trial Motions at 33. Moreover, the trial court advised that "counsel would get another opportunity to talk about the wealth of [Providence], punishment and deterring this type of conduct when they gave their closing arguments in the second phase of trial [relating to punitive damages]." **Id.** Despite this instruction, Appellant made the following comments in his closing argument:

> These [d]efendants or this [d]efendant, Providence…, is a corporation for profit. Things have changed. The home was taken over for a for-profit company. [I]f it's a for-profit company, it's

there to protect societies most vulnerable and enfeeble, the demented, the people that don't have a voice often, and they must do it responsibly. If they're going to break safety rules that endanger residents, then they need to be held accountable.

…

The cost report, 95.6 percent occupied. This is a case where exceptional profits were had at this facility, and they want to suggest that it was appropriately and properly staffed. They want to suggest just because they took the meticulous time to create these [patient hours per day (PPDs)] that the staff members had sufficient numbers to meet the needs of the residents, that the staff was appropriately trained to meet the needs of the residents. This is a full facility where the administrator said on the one hand his job is operations. On the other hand is the clinical side, but he wasn't paying attention to the clinical side. What he was paying attention to were the exceptional profits.

And remember who's responsible here, remember who the officers [are] that can make change here. These individuals, Richard Graciano, David Graciano, Jeff Graciano, Ross Neese, they never darkened the door of this courtroom. You didn't see any of them coming here. In fact, the testimony was that maybe they visited Providence … once, maybe twice in the, in the 15 years that [Ray DeMarco, the Administrator of Providence, has] worked there. They haven't sent someone here to watch the course of this trial, but you better believe that there's someone waiting by a phone at [Grane's] office in Pittsburgh on Sigma Drive to see what the jury will do, whether you will hold them accountable for what happened to [Ms.] Temple for the great harm that she suffered. They're banking on something. They're banking on the fact that because she's old and enfeeble[d], because she's still there, because their son, her son didn't visit as much as he probably should've that you all would discount that.

…

I have a lot of other things to say, but I'm just flipping through notes, and I think I'm just going to leave you with a few more things then sit down. Make no mistake that in this courtroom lines have been drawn. They haven't accepted responsibility or accountability at all. They're trying to have it both ways by saying, well, we're sorry that something bad happened, but we're not going to take any responsibility or take any blame for it whatsoever, none, not throughout this entire trial. Their positions

have shifted on issues. That they won't accept the obvious, that they caused this great harm, and they had ample opportunity to stop it. This did not have to be. This was not inevitable. It wasn't an unavoidable outcome. It became inevitable when they didn't listen to the alarms, when they didn't look at all of the safety indicators that were available. It became inevitable that bad things were going to happen to residents, and on 11/28 the inevitable became a reality for [Ms.] Temple. Their care was reckless and the problems were systemic.

And that's why we're going to ask that when you do get the verdict form, when you do have a chance to look at it, that you award a substantial verdict that will balance the harms here so this history doesn't keep repeating itself. It's in your hands, and you have the power to change things.

N.T. Trial, 5/23/2016, at 105-06, 118-20, 123-24.

We agree with the trial court that these comments were prejudicial and in contravention of the trial court's instruction. In light of the foregoing, we determine that the trial court had a basis to believe that the trial was unfair, given the cumulative effect of Appellant's improper conduct, along with other errors that prejudiced Providence.[8] Accordingly, we conclude that the trial

_____

[8] Along with the improprieties discussed above, the trial court also stated in its Rule 1925(a) opinion that "[i]n addition to the trial not being fair, we also do not believe [Appellant's] claim of inadequate staffing was properly supported by expert testimony." **See** Rule 1925(a) Opinion at 4. While we do not delve into whether expert testimony is required to support such claims in the case at bar, we believe that the sole testimony of Katherine McCombs, a former employee of Providence, was insufficient to establish Appellant's understaffing claim as Ms. McCombs did not work on Ms. Temple's unit at or near the time of her fall. **See** Providence's Brief at 31-32. Ms. McCombs explained that, though she worked at Providence from 2003 through 2013 as a certified nursing assistant (CNA) and served as the president of the union from 2009 through 2011, she was not working in the months surrounding Ms. Temple's fall due to an injury. **See** N.T. Trial, 5/16/2016, at 149-50, 152-53, 163, 198-200. In fact, the last time she had worked as a full-time CNA was in February 2011, about nine months before Ms. Temple's fall. **See id.** at 171,

court did not abuse its discretion in ordering a new trial for Providence on liability and compensatory damages.

In its second issue, Appellant states that the trial court erred when it entered a JNOV as to the punitive damages verdict award against Providence. **See** Appellant's Brief at 5, 63.[9] Appellant argues that this Court has previously deemed evidence of chronic understaffing sufficient to establish a claim for punitive damages. **See id.** at 64 (citing **Hall v. Episcopal Long Term Care**, 54 A.3d 381 (Pa. Super. 2012); **Scampone v. Grane Healthcare Co.**, 11 A.3d 967 (Pa. Super. 2010) (referred to herein as **Scampone I**)). Further, he states that punitive damages are warranted here as "Providence also failed to properly update and reassess [Ms. Temple's] care plan[,]" and "nearly 60% of the time, Providence was disregarding [Ms. Temple's] widely known fall risk" by not giving her the supervision and assistance she needed. **Id.** at 65 (citation omitted); Appellant's Reply Brief at 16. Appellant claims that Ms. Temple's "supervision was so lax that not a single caretaker had eyes on her when she fell for the third time." Appellant's Brief at 66 (citation omitted).

This Court has previously explained:

_____

201. As the trial court observed, "we only have the testimony of a single lay witness, who said the patients' needs, generally, were not being met." Opinion and Order on Providence's Post-Trial Motions at 13. Such evidence falls short.

[9] We note that, in the alternative to JNOV, the trial court granted a new trial to Providence on punitive damages. **See** Opinion and Order on Providence's Post-Trial Motions at 7, 17.

- 16 -

In reviewing a trial court's decision whether or not to grant judgment in favor of one of the parties, we must consider the evidence, together with all favorable inferences drawn therefrom, in the light most favorable to the verdict winner. … We will reverse a trial court's grant or denial of a [JNOV] only when we find an abuse of discretion or an error of law that controlled the outcome of the case. Further, the standard of review for an appellate court is the same as that for a trial court.

There are two bases upon which a [JNOV] can be entered; one, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that, even with all factual inferences decided adverse to the movant, the law nonetheless requires a verdict in his favor. Whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

**Hall**, 54 A.3d at 395 (citations, original brackets, and formatting omitted).

Further, our Supreme Court has elucidated:

The standard governing the award of punitive damages in Pennsylvania is settled. "Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." **Feld v. Merriam**, 506 Pa. 383, 485 A.2d 742, 747 (1984) (quoting Restatement (Second) of Torts § 908(2) (1979)); **see also Chambers v. Montgomery**, 411 Pa. 339, 192 A.2d 355, 358 (1963). As the name suggests, punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct. **See SHV Coal, Inc. v. Continental Grain Co.**, 526 Pa. 489, 587 A.2d 702, 704 (1991); **Feld**, 485 A.2d at 747-48; **Chambers**, 192 A.2d at 358. **See also** Restatement (Second) of Torts § 908, comment b. The purpose of punitive damages is to punish a tortfeasor for outrageous conduct and to deter him or others like him from similar conduct. **Kirkbride v. Lisbon Contractors, Inc.**, 521 Pa. 97, 555 A.2d 800, 803 (1989); Restatement (Second) of Torts § 908(1) ("Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future.").

Additionally, this Court has stressed that, when assessing the propriety of the imposition of punitive damages, "[t]he state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious." *See Feld*, 485 A.2d at 748; *see also Martin v. Johns–Manville Corp.*, 508 Pa. 154, 494 A.2d 1088, 1097 n.12 (1985) (plurality opinion).

In *Martin*, this Court considered the requisite state of mind which would constitute reckless indifference in this context, and we set forth the standard the courts are to apply when called upon to determine whether the evidence supports a punitive damages award on such a basis. Noting that Comment b to Section 908(2) of the Restatement refers to Section 500 as defining the requisite state of mind for punitive damages based on reckless indifference, this Court turned to Section 500, which states:

§ 500 Reckless Disregard of Safety Defined

The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

Restatement (Second) of Torts § 500.

Noting that Section 500 sets forth two very different types of state of mind as to reckless indifference, *Martin* stated that the first is "where the 'actor knows, or has reason to know, … of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk;'" and that the second is "where the 'actor had such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so.'" *Martin*, 494 A.2d at 1097 (quoting Restatement § 500 Comment a). *Martin* recognized that the first type of reckless conduct described in Section 500 "demonstrates a higher degree of culpability than the second on the continuum of mental states which range from specific intent to ordinary negligence[,]" because "[a]n 'indifference' to a known risk under Section 500[,] is closer to an intentional act than the failure to appreciate the degree of risk from a known danger." *Id.*

The **Martin** Court then stated that "[u]nder Pennsylvania law, only the first type of reckless conduct described in comment a to Section 500, is sufficient to create a jury question on the issue of punitive damages[,]" rejecting as insufficient the second type of recklessness, which is premised on a "reasonable man standard." **Id.** at 1097-98. In other words, this Court concluded that "an appreciation of the risk [of harm] is a necessary element of the mental state required for the imposition of [punitive] damages." **Id.** at 1097 n.12. In this regard, we reasoned that:

> The only purpose of punitive damages is to deter outrageous conduct. It is impossible to deter a person from taking risky action if he is not conscious of the risk. Thus, in **Feld v. Merriam**, 506 Pa. 383, 485 A.2d 742 (1984), we addressed the issue of when punitive damages are warranted and stressed that, in determining whether certain conduct is outrageous, "[t]he state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious." Similarly, the Restatement explains that "reckless indifference to the rights of others and conscious action in *deliberate* disregard of them … may provide the necessary state of mind to justify punitive damages." Comment b (emphasis added). Therefore, an appreciation of the risk is a necessary element of the mental state required for the imposition of such damages.

> **Id.**

> Thus, in Pennsylvania, a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk. **Id.** at 1097-98.

**Hutchison v. Luddy**, 870 A.2d 766, 770-72 (Pa. 2005) (footnote omitted; emphasis in original).

Here, in granting Providence's motion for JNOV regarding punitive damages, the trial court explained its reasoning as follows:

> After careful review of the testimony, we believe there was insufficient evidence regarding the state of mind of Providence to show that its conduct amounted to anything more than negligence. [Appellant's] expert, Nurse [Charlotte] Sheppard,

> testified that the staff "should've known that if they didn't provide appropriate supervision, an adverse outcome could happen." However, "should have known" is not the requisite state of mind for punitive damages. Further[,] she testified that "[t]hey knew something bad could happen if they didn't do something appropriately like supervise and update her care plan, yet they didn't do that." She did not identify who specifically knew this, and yet still failed to act.
>
> Nurse Sheppard testified that they "missed opportunities to go back and update the plan and make sure they were meeting [Ms.] Temple's needs" and that "the facility failed to anticipate her needs." These failures do not establish the state of mind necessary to impose punitive damages.
>
> Moreover, there was no assertion that the employees at Providence deliberately failed to take action, or that any of the employees appreciated an unusually high risk, but still failed to do anything about it. *See[,] e.g.*[,] ***Jones v. McDonald's Corp.***, 958 F.Supp. 234 (E.D. Pa. 1997) … ("If the defendant actually does not realize the high degree of risk involved, even though a reasonable man in his position would, the mental state required for the imposition of punitive damages in Pennsylvania is not present.")[.]

Opinion and Order on Providence's Post-Trial Motions at 4-5 (some internal citations omitted).

We agree with the trial court's observations. As it ascertained, Appellant does not point to any evidence demonstrating that Providence had a ***subjective appreciation*** of the risk of harm to which Ms. Temple was exposed due to its alleged failure to supervise her and update her care plan, and that Providence acted (or failed to act) in ***conscious disregard*** of that risk. ***See Hutchison***, 870 A.2d at 772.

We briefly distinguish two other nursing home liability cases — ***Scampone I*** and ***Hall*** — relied on by Appellant.[10]  In ***Scampone I***,

> the plaintiff-decedent was living in a nursing home, and in December of 2003, she was diagnosed with a urinary tract infection.  The plaintiff-decedent was hospitalized, treated, and returned to the nursing home in good condition.  The following month, she was re-admitted with another urinary tract infection, as well as dehydration, malnutrition, and bed sores.  On February 9, 2004, the plaintiff-decedent died of a heart attack at the age of 94.  The plaintiff-estate instituted an action against the nursing home and, at trial, the trial court concluded the evidence was insufficient to submit the question of punitive damages to the jury.  On appeal to this Court, the plaintiff-estate argued the trial court erred in failing to submit the issue of punitive damages to the jury and, in agreeing, a panel of this Court stated, in relevant part, the following:
>
> > We conclude that [p]laintiff's evidence established that both Highland and Grane[5] acted with reckless disregard to the right of others and created an unreasonable risk of physical harm to the residents of the nursing home.  The record was replete with evidence that the facility was chronically understaffed and complaints from staff continually went

---

[10] Both parties discuss chronic understaffing as a basis for punitive damages, so we will also address it herein.  However, the trial court did not seem to consider understaffing in its punitive damages determination, but instead indicated multiple times that it believed "[t]he punitive damages issue goes to the failure to document the prior fall and take necessary steps.  The failure to reassess her.  That's what I'm allowing the punitive damages to go to the jury on."  N.T. Trial, 5/19/2016, at 219.  ***See also*** N.T. Trial, 5/23/2016, at 77-78 ("I do think that if the testimony … is to be believed and that Providence should have reevaluated her and updated the care plan and provided more supervision based on her fall, they did not update the care plan.  They did implement some, some measures, but they did not do the updated care plan, and that could be deemed reckless, and that's why I'm letting that stay in.");  Opinion and Order on Providence's Post-Trial Motions at 2-6 (granting Providence's motion for JNOV with respect to punitive damages without discussing the issue of understaffing).

unheeded.[11]  Grane and Highland employees not only were aware of the understaffing that was leading to improper patient care, they deliberately altered records to hide that substandard care by altering ADLs[6] that actually established certain care was not rendered.  Records concerning the administration of medications were falsified.  Staffing levels were increased during state inspections and then reduced after the inspection was concluded.  Deliberately altering patient records to show care was rendered that was actually not is outrageous and warrants submission of the question

---

[11] This Court summarized the circumstances of understaffing in **Scampone I**, as follows:

> The witnesses established the existence of a chronic lack of sufficient employees at the Highland Park nursing home to provide sufficient care for all its residents.  The [registered nurse (RN)] who testified … worked on [the decedent's] unit, was acquainted with her, and testified about understaffing during his tenure at the facility.  [A licensed practical nurse (LPN)] stated that [the decedent] was treated the same as all other fourth-floor residents.  [One] CNA … was employed by Highland from 2003 through 2004, and rendered care to [the decedent].  He was unable to perform his tasks, including at times, filling water pitchers.  Another CNA … who worked at Highland from 2003 until 2005, helped care for [the decedent] from time to time and noticed untaken pills in her room.  [That CNA] also stated that [the decedent's] water pitcher was chronically empty.  In 2003 and 2004, [the fourth floor LPN from 7:00 a.m. to 3:00 p.m.] had to take care of thirty-eight to forty residents, and had difficulties completing her job responsibilities.  Since [the decedent] was a fourth floor resident at that time, [that LPN's] testimony necessarily included the care of [the decedent].  [The decedent's son] stated that his mother was not given water and pills.  [The plaintiff-estate's expert] established an absence of necessary RN care for nineteen days in January 2004.  [A responding paramedic's] testimony revealed that [the decedent] was not given fluids for days prior to being transferred to the hospital where she died.

**Scampone I**, 11 A.3d at 988-89.  Additionally, an RN testified that "CNAs specifically informed him that they did not have enough time to give patients water and to respond to call lights," and that he "relayed all the complaints that he heard to his supervisors."  **Id.** at 980, 981 (citations omitted).

> of punitive damages to the jury. Other evidence supporting an award of punitive damages included [the plaintiff-decedent's] lack of nursing care for a critical nineteen days prior to her death and her deplorable condition on January 30, 2004.[12] We also point to a note in her records that the poor woman was crying for water.
>
> 5 Highland was the nursing home facility, and Grane managed the nursing home.[13]
>
> 6 ADLs are care charts, which CNAs were required to complete in *Scampone [I]*.
>
> *Scampone [I]*, 11 A.3d at 991–[]92 (footnotes added).

*Hall*, 54 A.3d at 395-96 (summarizing *Scampone I*; some internal citations omitted).

Second, in *Hall*, the estate of a deceased nursing home resident proceeded to a jury trial against a nursing home operator on a claim of negligence. *Hall*, 54 A.3d at 385. On appeal, this Court determined, *inter alia*, that the trial court erred in granting the operator's motion for a directed verdict with regard to a claim for punitive damages brought by the estate. *Id.* at 396. In doing so, we explained that "the record was replete with evidence

---

[12] The responding paramedic on January 30, 2004, testified that the decedent "had severe skin tenting, which is a sign of dehydration[,]" and the on-duty RN informed the paramedic that the decedent "had not been given any fluid for quite a few days" and "had been unable to swallow her medication for a couple days." *Scampone I*, 11 A.3d at 987 (citations and internal quotation marks omitted).

[13] We note that *Scampone I* involved the same corporate defendant — Grane — as the case at bar. *See* Appellant's Brief at 66 (noting that *Scampone I* "involved the same corporate defendant (Grane Healthcare)"); Providence's Brief at 38 n.3 (acknowledging that Grane was also a defendant in *Scampone I*).

that the nursing home was chronically understaffed and complaints from the staff went unheeded[,]"[14] and the estate proffered evidence that the operator's employees "were not only aware of the understaffing, which led to improper patient care, but they deliberately increased staff during times of state inspections and then reduced such after the inspection was concluded." *Id.* at 397. Further, "the [e]state presented ample evidence that the deceased continuously cried out in pain from September of 2003 to November of 2003 when nurses assisted her with range of motion exercises and applied splints to her legs; however, the staff completely disregarded her severe pain." *Id.*[15] The estate additionally "presented evidence that nurses falsified care logs, thus indicating the deceased had received care at the nursing home when, in fact, the deceased was admitted into the hospital[,]" and "there were entire

_____

[14] Specifically, a CNA testified that the floor where the deceased resided "was short on staffing and so [staff] really couldn't do the adequate care." *Hall*, 54 A.3d at 387 (citation and internal quotation marks omitted). Another CNA testified that "the nursing home was short staffed all the time[,]" and "because of understaffing, she was tired and unable to give the residents the care they really needed, including changing the residents' diapers in a timely manner." *Id.* at 388 (citations omitted). Yet another CNA testified that "the nursing home was regularly short-staffed, which would prevent all of the residents, including the deceased, from having their diapers changed in a timely manner." *Id.* (citation omitted). Notably, all three of these CNAs testified that they had worked on the deceased's floor on at least one occasion at the time when the neglect occurred. *Id.* at 387, 388.

[15] A nurse admitted that "the deceased's physician would rely on the nurses to report if the deceased was experiencing pain[,]" and that "from September of 2003 until November 11, 2003, the deceased, who was receiving 25 micrograms of the Duragesic patch, 'screamed' out in pain during the range of motion exercises, which occurred six days a week." *Hall*, 54 A.3d at 387 (citation omitted).

months when the deceased was not given a bath and … was left to lie in her own filth." ***Id.*** (citation omitted).

We consider both ***Scampone I*** and ***Hall*** to be readily distinguishable. To begin, in both of those cases, "the record was ***replete*** with evidence that the nursing home was chronically understaffed and complaints from the staff went unheeded." ***See Hall***, 54 A.3d at 397 (emphasis added); ***see also Scampone I***, 11 A.3d at 991. That was not the case here. As the trial court pointed out, there was only ***one*** witness — Katherine McCombs — who testified that "the facility was short-staffed at times and she received grievances to this effect." Opinion and Order on Providence's Post-Trial Motions at 10 (citation omitted). However, Ms. McCombs had not worked on Ms. Temple's unit at or near the time of her fall. ***See*** footnote 8, ***supra.*** In addition, as discussed above, Appellant argues that Providence did not re-evaluate and update Ms. Temple's care plan after her first two falls, and states that she regularly did not receive the supervision or assistance she needed while walking and transferring. ***See*** Appellant's Brief at 65; Appellant's Reply Brief at 16. While Providence may have been negligent in rendering such care, we reiterate that Appellant identifies no evidence that Providence understood the risk of harm to Ms. Temple due to these lapses and nevertheless consciously failed to do these things. In comparison, in ***Hall*** and ***Scampone I***, the plaintiffs proffered evidence that staff purposely falsified care logs and knowingly disregarded patients' severe pain and thirst. Further, when viewed relative to ***Hall*** and ***Scampone I***, we agree with the trial court that

Providence's conduct was not "the type of outrageous or egregious conduct that punitive damages are designed to deter." Opinion and Order on Providence's Post-Trial Motions at 5; **see also Hutchison**, 870 A.2d at 770 ("[P]unitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct.") (citation omitted). Thus, for the foregoing reasons, the trial court properly granted JNOV in favor of Providence with respect to punitive damages.

Finally, in his last issue, Appellant argues that the trial court erred when it dismissed Grane from the case on a motion for compulsory nonsuit. **See** Appellant's Brief at 66. In granting the nonsuit in favor of Grane, the trial court determined — after conducting the five-part test set forth in **Althaus v. Cohen**, 756 A.2d 1166 (Pa. 2000),[16] — that Grane did not owe a duty to Ms. Temple and, even if it did, Appellant "offered no expert testimony to demonstrate that Grane's actions fell below the accepted standard of care,

_____

[16] In **Althaus**, our Supreme Court explained:

> [T]he legal concept of duty of care is necessarily rooted in often amorphous public policy considerations, which may include our perception of history, morals, justice and society. The determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution.

**Althaus**, 756 A.2d at 1169 (citations omitted).

and that this breach caused [Ms.] Temple's injuries." **See** Opinion and Order on Appellant's Post-Trial Motion at 2, 13-14. In response, Appellant claims that the trial court erred by unnecessarily conducting an **Althaus** analysis and wrongly concluding that Grane owed no duty to Ms. Temple. **See** Appellant's Brief at 67, 73. Instead, pursuant to the Restatement (Second) of Torts §§ 323 and 324(A), Appellant insists that "once Grane started providing its services to [Providence], it had an obligation to do so in a reasonable manner." **Id.** at 70 (citing, in part, Restatement (Second) of Torts §§ 323 and 324(A)).

We agree with Appellant that the trial court should not have conducted an **Althaus** analysis. While this appeal was pending, this Court issued our opinion in **Scampone v. Grane Healthcare Co.**, 169 A.3d 600 (Pa. Super. 2017) (referred to herein as **Scampone II**), the longstanding nursing home case discussed above where the decedent suffered from dehydration, among other things.[17] Therein, we examined whether the trial court properly entered a nonsuit in favor of Grane, the company that managed the nursing home, Highland. In determining whether Grane owed a duty to the decedent, the **Scampone II** Court explained that the **Althaus** factors are "more relevant to the creation of new duties than to the vindication of existing ones[,]" and "if a common law duty exists under the Restatement (Second) of Torts, the **Althaus** analysis is not necessary." **Id.** at 617 (citing **Alderwoods**

_____

[17] The **Scampone** case "has been to this Court twice, the Supreme Court once, and the trial court twice." **See Scampone II**, 169 A.3d at 605. For a thorough summary of its history, **see id.** at 605-10.

- 27 -

*(Pennsylvania), Inc. v. Duquesne Light Co.*, 106 A.3d 27 (Pa. 2014)). Rather than conducting an *Althaus* analysis in *Scampone II*, we concluded that Grane owed a duty of care to the decedent in that case under the Restatement (Second) of Torts §§ 323 and 324A. *Id.* at 618-19. Section 323 sets forth:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> > (a) his failure to exercise such care increases the risk of such harm, or
> >
> > (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323.

> Additionally, Section 324A states:
>
> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> > (a) his failure to exercise reasonable care increases the risk of such harm, or
> >
> > (b) he has undertaken to perform a duty owed by the other to the third person, or
> >
> > (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A.

The *Scampone II* Court determined that, under section 323, "Grane contractually undertook to render services to residents of Highland's nursing

home by managing the care provided to them and by overseeing the operations of the facility, and Grane should have recognized those services were necessary for the protection of those elderly and infirm residents." **Scampone II**, 169 A.3d at 619. Thus, we concluded that "[i]t is subject to liability for any physical harm resulting from its failure to exercise reasonable care in the performance of this undertaking." **Id.** Furthermore, we decided that Grane also had a duty under section 324A as "Grane agreed to manage medical and patient care services rendered to the residents of a nursing home, which it should have recognized as necessary for their protection." **Id.** Therefore, "[i]f a jury finds, based upon the evidence of negligence and causation presented, that Grane failed to exercise reasonable care in this undertaking and its failure to ensure proper patient care increased the risk of harm caused to [the decedent] or that it undertook to perform a duty owed by Highland to [the decedent], then the [p]laintiff can recover, and entry of a nonsuit was improper." **Id.**

In light of the intervening **Scampone II** decision, the trial court's application of the **Althaus** factors and its determination that Grane owed no duty to Ms. Temple was erroneous. The contract between Grane and Providence in and of itself was sufficient to establish that duty under the

Restatement (Second) of Torts §§ 323 and 324A. ***See Scampone II***, 169

A.3d at 619.[18]

Having concluded that Grane did indeed owe a duty to Ms. Temple, we

now consider whether there was enough evidence to get to the jury.

> Nonsuit should not be granted unless it is clear that the plaintiff
> has not established a cause of action or any right to relief against
> the party in question. When we determine if the plaintiff has

---

[18] The management agreement in this case is the same in all material respects as the agreement between Grane and Highland reviewed in ***Scampone II***. ***See Scampone II***, 169 A.3d at 611, 618; Appellant's Exhibit 15; Appellant's Reply Brief at 29. That agreement requires Grane, as the Manager, to do the following on behalf of the Operator, Providence Care Center, LLC, at the Facility, Providence Care Center:

> Section 1.2.1 … Manager shall assist in the implementation and administration of the employment policies and procedures of the Operator. …

> Section 2.1 … [T]he Manager shall through its operating officers and the Manager's Representative, and at the expense of the Operator, manage all aspects of the operation of the Facility, including, but not limited to the following:

> 2.1.1 Nursing Consulting Services. Establish and administer a quality assurance program to assure the Facility provides quality nursing services to its residents. …

> Section 4.1 Compliance
> The Manager shall use its best efforts to comply on behalf of the Operator with all applicable Federal, State and Local laws, rules and regulations including State and Local life and safety codes relating to the Facility and in the same fashion operate the Facility so that it shall maintain all necessary licenses, permits, consents and approvals from all governmental agencies which have jurisdiction over the operation of the Facility. …

Appellant's Exhibit 15.

established the right to recover, the plaintiff must be allowed the benefit of all favorable evidence and reasonable inferences arising therefrom, and any conflicts in the evidence must be resolved in favor of the plaintiff. This Court will reverse an order refusing to remove a nonsuit if the trial court either abused its discretion or committed an error of law.

**Scampone II**, 169 A.3d at 611 (internal citations and quotation marks omitted).

Here, the trial court concluded that Appellant "provided no expert testimony demonstrating that Grane's conduct fell below the standard of care." Rule 1925(a) Opinion at 1. According to the trial court, Appellant's "case as to Grane revolved around the assertion that Grane was in charge of setting staffing levels at the facility, that Grane did not set proper staffing levels at the facility, and that the lack of staff caused or contributed to [Ms.] Temple being unsupervised and falling." **See** Opinion and Order on Appellant's Post-Trial Motion at 14.[19] The trial court then concluded that Appellant's expert, Nurse Sheppard, "continually spoke of 'the facility' and even defined direct care, but made no mention of Grane's standard of care,

_____

[19] This is not entirely accurate. Appellant also claimed that policies and procedures set by Grane, and adopted by Providence, contributed to Ms. Temple's fall. **See, e.g.**, N.T. Trial, 5/16/2016, at 43-44 (asserting in Appellant's opening statement that "Grane … was also responsible for ensuring that the rules were followed to ensure that residents were not needlessly endangered"); N.T. Trial, 5/19/2016, at 181 (arguing that "if Grane has a duty to, … if, per contract they're going to … assure the best efforts, [are] made to comply with federal regulations. You asked what regulation they breached. We've had ample testimony that the regulation was breached as to failure to supervise and prevent accidents"); **id.** at 195 ("[I]n terms of evidence that Grane … breached the duty of care, … we have evidence that the regulations weren't followed, we have evidence that … the policies and procedures that they implemented weren't followed….").

or of any actions or inactions by Grane." *Id.* at 15. These conclusions constitute a misreading of Nurse Sheppard's expert report and the testimony presented at trial.

The jury heard testimony from Ms. Lengle, Grane's Vice President of Nursing Services. She testified that Grane was to use its best efforts to comply on behalf of facilities with all applicable federal, state and local regulations, and that she recommended policies to be followed at facilities, particularly relating to federal regulations. *See* N.T. Trial, 5/18/2016, at 187-88; *id.* at 207 (testifying that facilities "were allowed to change the policies [she provided to them] to meet the individual needs of their building and their residents unless it was a federal regulation. If the policy was based on a federal regulation, I would expect them to follow that, yes"); *id.* at 228 (explaining that "the general policies that I supplied, every single one, was directly reflected [*sic*] of a federal regulation in long-term care"). She acknowledged that she had a role in making sure there was enough staff at facilities, and made recommendations as to staffing for the facilities at times. *See id.* at 194-95. Ms. Lengle also stated that she had access to facilities' clinical records, and was responsible as a consultant for recognizing problems within those records and asking for changes. *Id.* at 222.

In addition, Appellant presented expert testimony to explain how Providence's failure to follow policies and safety rules fell below the standard of care. Specifically, Nurse Sheppard explained to the jury how care is managed in a nursing home, and testified extensively about her qualifications

in understanding the relationship between management companies and nursing facilities. ***See id.*** at 48-55. She was qualified as an expert and went on to testify about regulations that Providence was required to follow. Namely, Nurse Sheppard discussed 42 C.F.R. § 483.25(h) (effective Oct. 7, 2005 to Nov. 27, 2016), which states, *inter alia*, that the facility must ensure that "[e]ach resident receives adequate supervision and assistance devices to prevent accidents." ***See*** Appellant's Exhibit 8 (setting forth 42 C.F.R. § 483.25(h) and guidance to surveyors); ***see also*** N.T. Trial, 5/18/2016, at 71, 78-79. Nurse Sheppard opined that Providence failed to provide Ms. Temple "with the level of supervision that she needed to keep her safe, and [it] had failed on at least two occasions to go back and update her care plan to direct the staff to provide her with supervision." N.T. Trial, 5/18/2016, at 136. Further, Nurse Sheppard testified to the following:

> [Appellant's counsel:] And we talked much earlier about the … factors that you look at under the regulation in determining avoidable versus unavoidable [accidents].[20] We talked about

---

[20] According to Nurse Sheppard,

> avoidable and unavoidable accidents are different incidents. [T]he regulations use that term for a couple different things, and the key with calling something an unavoidable accident would mean that you actually did everything that you were supposed to do to prevent it, so unless you've done everything that you were supposed to do including assessing them, implementing care, changing the plan, then you can't say it was an unavoidable accident, so the regulation actually tells us that, so they tell you that in order to say that this was an unavoidable accident, you

proper supervision. Did you see from your review of the records whether or not there was proper supervision here?

[Nurse Sheppard:] There was not proper supervision here. Although [Ms. Temple] was in a[n] area [that] should be considered a location that needs supervision, this is a common area where there would be other residents and activities going on and tables and chairs, different obstacles to get around, meal trays, food, different things that were being introduced to the environment, this is an area that absolutely should've been supervised, and [Ms.] Temple should've been supervised.

*Id.* at 123-24. Referencing a citation by Department of Health and Human Services surveyors, Nurse Sheppard also stated that she had reviewed documents indicating that this particular location in the facility was not being appropriately supervised prior to Ms. Temple's fall, in contravention of 42 C.F.R. § 483.25(h). *See id.* at 130; *see also* Appellant's Exhibit at 14. Ultimately, Nurse Sheppard determined that Ms. Temple's fall was the result of the violation of policies and safety rules in place at Providence. *Id.* at 137.

---

had to have done X, Y, Z, and they actually list out up there what the things you had to do before you can call it unavoidable.

N.T. Trial, 5/18/2016, at 80-81; *see also* Appellant's Exhibit 8 (defining "avoidable accident" as an accident that occurred because the facility failed to, *inter alia*, "[i]mplement interventions, including adequate supervision, consistent with a resident's needs, goals, plan of care, and current standards of practice in order to reduce the risk of an accident…"). Nurse Sheppard stated that "the supervision level varies depending on what's going on, depending on their resident and depending on other factors in the facility." N.T. Trial, 5/18/2016, at 82; *see also* Appellant's Exhibit 8 ("Adequate supervision is defined by the type and frequency of supervision, based on the individual resident's assessed needs and identified hazards in the resident environment. Adequate supervision may vary from resident to resident and from time to time for the same resident.").

Based on the foregoing, and in light of our standard of review, the trial court erred in determining that Appellant did not present expert testimony. When the expert testimony is read in conjunction with the testimony from Ms. Lengle, a jury could conclude that Grane breached its duty to Appellant. In the management agreement, Grane agreed to establish and administer a quality assurance program to assure that Providence provides quality nursing services to residents, and promised to use its best efforts to comply on behalf of Providence with all applicable federal, state and local laws, rules and regulations. *See* Appellant's Exhibit 15. Viewed in the light most favorable to Appellant, the testimony of Ms. Lengle and Nurse Sheppard suggests that Grane failed to exercise reasonable care in performing these undertakings that it should have recognized as necessary for the protection of Providence's residents. Accordingly, we reverse the order granting a nonsuit in favor of Grane and permit the new trial to include Grane once again.

Thus, to summarize, the order of the trial court granting Providence a new trial on liability and compensatory damages is affirmed. In addition, we uphold the JNOV entered in favor of Providence on punitive damages. However, we reverse the order granting a nonsuit in favor of Grane so that the new trial may include Grane.

Order affirmed in part and reversed in part. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/10/2018